**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RODNEY SCOTT MAHER, d/b/a
Creative Furniture and Waterbeds,
Plaintiff-Appellant,

v.

No. 94-1754

CONTINENTAL CASUALTY COMPANY,
Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of West Virginia, at Parkersburg.
Charles H. Haden II, Chief District Judge.
(CA-93-916-6)

Argued: September 28, 1995

Decided: February 14, 1996

Before WIDENER, HALL, and MOTZ, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Hall wrote the opinion, in which Judge Widener and Judge
Motz joined.

_____

**COUNSEL**

**ARGUED:** Joseph W. Caldwell, CALDWELL, CANNON-RYAN &
RIFFEE, Charleston, West Virginia; Vincent Jerome King, Charleston, West Virginia, for Appellant. Richard Allen Hayhurst, Parkersburg, West Virginia, for Appellee.

_____

**OPINION**

HALL, Circuit Judge:

In this diversity action, Rodney Scott Maher appeals the district court's dismissal of his claim against Continental Casualty Co. for unfair insurance claim settlement practices under the West Virginia Unfair Trade Practices Act. Maher, who filed an insurance claim with Continental following a fire at his furniture store, also appeals that aspect of the judgment order awarding him only $5,118 in lost business income compensable under the policy. We affirm the amount awarded under the insurance contract, but we vacate the district court's dismissal of the statutory claim and remand for further proceedings.

I.

A.

On April 5, 1990, Maher, the owner of Creative Furniture and Waterbeds in Vienna, West Virginia, contracted with Continental to procure casualty insurance for his business premises. On November 15, 1990, a faulty gas heater caused a fire at the furniture store. Although the fire was confined to a rear storage area, there was extensive smoke damage to the second-floor inventory of waterbeds and billiard tables; in addition, powder from the fire extinguishers found its way onto the carpet and exposed surfaces. Until the end of November, when cleanup was completed, smoke odor and chemical fumes from the cleaning materials lingered throughout the building.

Shortly after the fire, Maher contacted Continental, which sent a claims adjuster, Danny Patrick, to inspect the premises. Patrick advised Maher to keep the business open and sell the damaged goods at a discount. Maher followed Patrick's advice; he also hired a contractor to make repairs to the building. Although the structure's exterior was restored within two weeks of the fire, the contractor refused to begin repairing the more extensively damaged interior until he had been paid for the completed work.

2

Maher phoned Patrick twice during those two weeks; Patrick responded that he had not yet had time to review Maher's claim. On November 30, Patrick returned to Maher's store to survey the partial restoration work and to discuss the extent of the damage to the inventory. During their conversation, Maher asked Patrick about being compensated for lost business income, as provided for in the policy. Patrick opined that such losses were "too difficult to prove," but suggested that Maher nevertheless prepare a written projection.

On December 4, Maher submitted written documentation to Continental of the cost of repairing the premises and replacing the damaged merchandise. Throughout December, Maher repeatedly telephoned Patrick to inquire about the status of that claim. The month passed, however, with Continental failing to either issue a settlement check or contest the repair and replacement estimate. Without the insurance settlement in hand, Maher was unable to purchase new inventory; his remaining stock proved inadequate to meet consumer demand during the Christmas shopping season.

Early in January 1991, Maher forwarded to Continental a CPA's written estimate of lost sales from November 16 through December 31, 1990. On January 8, Patrick informed Maher that there would be no coverage for lost income because the business had not completely shut down; Continental confirmed its denial of coverage in writing on January 21.[1] Although Continental did not dispute its liability for the

_____

[1] Continental relied on the following clause to deny coverage:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration."

Though not defined in the policy, Continental took the position that "suspension" meant "cessation" -- a complete shutdown of the entire business. However, as the bankruptcy judge later pointed out in granting summary judgment to Maher on the issue of coverage, the insurer's position was wholly at odds with another policy provision:

> We will reduce the amount of your Business Income loss . . . to the extent you can resume your "operations," in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

The above paragraph clearly contemplates that a policyholder may be compensated for lost income, regardless of whether the business continued to operate at a reduced level immediately following the covered loss.

3

building repairs and inventory losses, it failed to settle those claims until February 13, 1991 -- almost three months after the fire.

The settlement, totaling approximately $21,000, provided Maher with some much-needed liquidity. His business nevertheless failed to recover from losing virtually an entire season of holiday sales. On February 28, 1992, Maher filed for bankruptcy under Chapter 13; Creative Furniture and Waterbeds closed its doors forever on December 28, 1993.

B.

In July 1991, Maher filed a complaint in state court, alleging that Continental had breached the insurance contract and, consequently, had injured his business. Maher's complaint also alleged that Continental had engaged in unfair insurance claim settlement practices, in contravention of the West Virginia Unfair Trade Practices Act. Shortly after he filed for bankruptcy in 1992, Maher removed the case to the district court, which in turn referred the matter to the bankruptcy court.[2]

Following a bench trial, the bankruptcy judge recommended that Continental be found liable under the policy for approximately $88,100 in lost business income. In addition, the bankruptcy judge concluded that Continental had engaged in unfair claim settlement practices, and proposed that the company pay Maher $126,723 in consequential damages, $22,500 for inconvenience and aggravation, and

_____

[2] The jurisdiction of bankruptcy courts is delineated by 28 U.S.C. § 157, which provides, in pertinent part:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

28 U.S.C.A. § 157(c)(1) (West 1995).

4

$30,000 in punitive damages. Finally, the bankruptcy judge recommended an attorney fee award amounting to twenty percent of the total damages.

The district court declined to adopt the bankruptcy judge's recommendations. See note 2, supra. Although it agreed that the lost income from Maher's business was covered under the policy and that Maher had a colorable claim against Continental for unfair settlement practices, the court decided to bifurcate the claims and retry both before juries. On January 13, 1994, Maher refused Continental's offer of $12,000 to settle the policy dispute. On March 29, 1994, trial commenced on the sole issue of the compensation due Maher under the insurance contract.

Steven Kalt, a Certified Public Accountant, testified as Maher's expert, as he had done previously before the bankruptcy judge. Kalt first explained how he had calculated the lost business income at Maher's furniture store. Kalt said that he had examined the sales of waterbeds and billiard tables for the three years prior to 1990, then used the smallest annual growth rate in sales of each to project future gross sales for the remainder of 1990 and the years beyond.[3] Kalt testified that he subtracted sales tax and the cost of goods sold to arrive at an estimate of net income.[4]

When Kalt began to testify as to his actual projections, the defense objected that the testimony was speculative and without foundation. The court sustained the objection, allowing Kalt to testify only that Maher had lost $5,118 of business income during the two and one-half weeks immediately following the fire.[5] Maher's counsel then

_____

[3] Billiard table sales had increased at least 47 percent, and waterbed sales a minimum of about 9.6 percent, in the years immediately preceding 1990.
[4] According to the terms of the policy, net income plus normal operating expenses, including payroll, equals "business income." The difference between the business's actual income and that which would have accrued is the loss for which Continental was bound to indemnify Maher.
[5] The parties stipulated that, had Continental promptly paid Maher's claim for property damage, the business would have been completely restored in two and one-half weeks.

5

attempted, without success, to further develop the evidentiary foundation underlying Kalt's testimony. Upon ascertaining that Kalt was Maher's sole source of evidence regarding the lost business income, the district court granted Continental's motion for judgment in favor of Maher for $5,118.

Following a short recess, the district court dismissed, sua sponte, Maher's statutory claim for unfair settlement practices. The court held that the claim was precluded under West Virginia law because Maher had not "substantially prevailed" on the underlying policy dispute by obtaining a judgment for less than Continental's settlement offer. The district court's decision to limit Continental's liability to that imposed by the insurance contract foreclosed Maher from recovering any consequential or other damages attributable to the insurer's conduct in resolving the claim.

On appeal, Maher suggests that we ratify the bankruptcy judge's measure of compensation due him under the insurance policy for lost business income; alternatively, he requests a new trial of the issue. Maher also asks us to reverse the district court's dismissal of his claim against Continental for unfair settlement practices.

II.

A.

Maher contends that the district court's review of the bankruptcy judge's proposed findings and conclusions was void ab initio because the court impaneled a jury after Continental had already waived its right to a jury trial.[6] Maher maintains that, as a result, the findings and conclusions of the bankruptcy judge should be reinstated.

Maher's argument is not well taken. Maher does not question the district court's authority pursuant to 28 U.S.C. § 157(c)(1), see note

_____

[6] Continental's answer, filed in state court, had included a demand for a jury trial. Because Maher's suit for money damages constituted a "legal" -- as opposed to equitable -- cause of action, Continental was constitutionally entitled to a jury trial. Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 41 (1989).

6

2, supra, to substitute its own findings and conclusions for those of the bankruptcy judge. That the court opted to delegate its role as fact-finder to a jury is of no consequence, inasmuch as such delegation is specifically authorized by the Federal Rules:

> Issues not demanded for trial by jury . . . shall be tried by the court; but, notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by a jury of any or all issues."

Fed. R. Civ. P. 39(b) (emphasis supplied). Plainly, the district court was well within its discretion in ordering a jury trial.

B.

Maher asserts that, even if the district court were entitled to try anew the extent of Continental's liability under the policy, it nonetheless abused its discretion by severely curtailing Kalt's testimony regarding the matter. Again, we must disagree.

West Virginia law allows for the recovery of lost profits in an action for breach of contract, insofar as such profits are proved with "reasonable certainty." Cell, Inc. v. Ranson Investors, 427 S.E.2d 447, 448 (W. Va. 1992). Estimates based on "mere speculation and conjecture" are insufficient to establish the requisite degree of certainty. Id. Indeed, more exacting proof of lost profits may be required where the business is a relatively new, less-established one. [7] The plaintiff's burden is not an impossible one, however. Lost profits may be established with reasonable certainty through the introduction of evidence such as economic and financial data, market surveys and analyses, business records of similar enterprises, and -- of course -- expert testimony to assist the jury in comprehending it all. See id. at 449-50 (quoting Restatement (Second) of Contracts§ 352 cmt. b (1981)).

_____

[7] See Cell, 427 S.E.2d at 449 ("Although the courts of most other jurisdictions share our concern for the risk of allowing speculative loss of profit awards for new businesses, virtually all believe that those concerns can be addressed by requiring a high level of proof.").

7

Maher's proffered evidence fell short of proving Creative Furniture's lost income with reasonable certainty. Although he submitted historical sales figures for the relatively brief three-year period before the fire, Maher did not attempt to compensate for the dearth of financial data by adducing competent evidence of the business's economic situation. For example, Maher failed to conduct any scientifically valid surveys assessing the relevant future market for billiard tables and waterbeds, and made no attempt to prove his loss by comparing his post-accident sales to the sales figures of any similarly situated businesses in the market area.

Moreover, Kalt -- though doubtless an expert in analyzing financial statements -- is not an economist, and he did not purport to otherwise possess any expertise regarding economic forecasting.[8] Yet, in the absence of long-term sales figures, Maher's best hope of proving his lost business income with reasonable certainty was to produce sufficient economic data upon which an economist could posit a reliable prediction. Faced with the utter lack of such evidence, the district court did not abuse its discretion by limiting the period of loss under the policy to the two-and-one-half weeks following the fire, and then entering judgment for Maher in the stipulated amount. We therefore affirm the court's judgment in that regard.

III.

We now consider whether the district court, following its entry of judgment for Maher on the breach of contract claim, erroneously dismissed the remaining claim alleging that Continental had engaged in unfair insurance claim settlement practices.

_____

[8] Indeed, Kalt's methodology required no expertise at all. Any reasonably intelligent lay person asked to extrapolate a business's fourth year sales solely by considering the annual increases between Years 1-3 might very well -- depending on how conservative or extravagant an estimate was requested -- intuitively pick the smallest or largest increase, or an average of the increases. Such an approach does not consider, among many other things, the maturity of the business, the types of goods sold, and the likelihood of short-term changes in the market for those goods.

8

A.

Section 4 of the West Virginia Unfair Trade Practices Act, W. Va. Code § 33-11-1 et seq., devoted entirely to the business of insurance, proscribes a host of unfair methods of competition, as well as many acts or practices deemed to be unfair or deceptive. **9** No fewer than fifteen prohibited practices specific to claim settlements are set forth in Subsection (9).**10** West Virginia recognizes a private cause of action

_____

**9** For instance, in addition to the unfair claim settlement practices described infra, all sorts of misrepresentation and false advertising are prohibited, as are certain acts respecting insurers' dealings with their competitors. In addition, company stock may not be offered as an inducement to purchase insurance, kickbacks are disallowed, and insurers may not discriminate as to rates or coverage among like risks. Insurers must also maintain complete records of all written complaints and their dispositions.

**10** Subsection (9) provides, in pertinent part:

> Unfair claim settlement practices. - No person shall commit or perform with such frequency as to indicate a general business practice any of the following:
>
> (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
>
> (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
>
> (c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
>
> (d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
>
> (e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
>
> (f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
>
> (g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered;

for damages arising from an insurer's violations of Subsection (9), whether the injured party is the insured or a third-party claimant.

_____

(h) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

(i) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

(j) Making claims payment to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;

(k) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

(l) Delaying the investigation or payment of claims by requiring an insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(m) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

(n) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

(o) Failing to notify the first party claimant and the provider(s) of services covered under accident and sickness insurance and hospital and medical service corporation insurance policies whether the claim has been accepted or denied and if denied, the reasons therefor, within fifteen calendar days from the filing of the proof of loss. . . .

W. Va. Code § 33-11-4(9) (Michie 1992). More than a "single isolated violation" of Subsection (9) must be proved in order to establish the "general business practice" required by the statute. Jenkins v. J.C. Pen-

10

Jenkins v. J.C. Penney Casualty Ins. Co., 280 S.E.2d 252, 258 (W. Va. 1981).**11**

Specifically, Paragraph (g) of Subsection (9) proscribes

"[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds,

when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered." W. Va. Code§ 33-11-4(9)(g)

(Michie 1992); see note 10, supra. This provision is similar in many respects to the cause of action first announced by the Supreme Court of Appeals of West Virginia in Hayseeds, Inc. v. State Farm Fire &

Casualty, 352 S.E.2d 73 (W. Va. 1986), on which the district court relied in dismissing Maher's claim for unfair settlement practices.

_____

ney Casualty Ins. Co., 280 S.E.2d 252, 260 (W. Va. 1981). This requirement sometimes compels an aggrieved plaintiff to contact other claimants, insureds, and attorneys who have previously dealt with the insurer. Id. Nevertheless, where an insurer is alleged to have engaged in more than one of the listed prohibited practices, that the violations occurred during the course of the insurer's processing of a single claim may be sufficient to establish a general business practice. Id. The factual basis for each violation, however, may not be the "same isolated scenario." Russell v. Amerisure Ins. Co., 433 S.E.2d 532, 536 (W. Va. 1993). The Russell caveat presents no difficulty for Maher in the instant proceeding, inasmuch as he had repeated contact with Continental and its claims agent over the course of several months. Moreover, Maher's claim consisted of two decidedly distinct categories of loss: property damage and lost business income. The categories were covered under separate provisions of the insurance policy, and a number of Continental's alleged violations relate to its handling of one -- but not the other -- category.

**11** **See also Romano v. New England Mut. Life Ins. Co.**, 362 S.E.2d 334, 337 n.3 (W. Va. 1987) ("We recognized in Jenkins . . . that a violation of [Subsection (9)] by an insurer gives rise to a private right of action in favor of an aggrieved insured or beneficiary.").

11

1.

The court in <u>Hayseeds</u> held that, in cases where a policyholder sues his own insurer over a property damage claim and substantially prevails, the insurer may be held liable for consequential damages flowing from the delay in payment, certain quasi-compensatory damages such as aggravation and inconvenience, the policyholder's reasonable attorney fees, and -- in an appropriate case -- punitive damages. <u>Id.</u> at 80-81.**12** The district court dismissed Maher's claim under § 33-11-4(9) on the ground that, because he had obtained a judgment that was less than Continental's pretrial offer of settlement, <u>see</u> Section I-B, <u>supra</u>, he had failed to substantially prevail on the lost business income claim.

However, <u>Hayseeds</u>, by its own terms, applies only to disputes involving claims for <u>property damage</u>. Although Maher filed a claim with Continental for damage to the furniture store's structure and contents, neither the legitimacy nor the amount of that claim has ever been in dispute. Rather, the focus in the underlying litigation has been on Maher's separate claim under the policy for the lost income resulting from the partial shutdown of his business. Because the underlying claim at issue is not one for property damage, <u>Hayseeds</u> and its progeny are inapposite.**13**

Instead, we need only look to § 33-11-4(9)(g) itself. Because its provisions apply to <u>any</u> type of insurance claim upon which litigation

---

**12** The phrase "substantially prevails" refers to a comparison of the judgment obtained by the insured with the status of the property damage claim at the time the negotiations broke down. <u>Thomas v. State Farm Mut. Auto. Ins. Co.</u>, 383 S.E.2d 786, 790 (W. Va. 1989); <u>see also</u> <u>Smithson v. U.S. Fidelity & Guar. Co.</u>, 411 S.E.2d 850, 858 (W. Va. 1991) (the parties' respective offers of settlement prior to a binding loss appraisal proceeding determine whether the claimant has substantially prevailed).

**13** Of course, Maher's cause of action under § 33-11-4(9) is not circumscribed solely by Continental's actions regarding the lost business income claim. The insurer's handling (or mishandling) of the property damage claim may also serve to establish one or more violations of the statute. <u>See</u> note 15, <u>infra</u>, and accompanying text.

is commenced, the statutory right that it confers is broader in scope than the common-law cause of action established in Hayseeds. To prevail, however, a plaintiff must prove additional statutory violations that would constitute a "general business practice." See note 10, supra. In contrast, an insured or claimant who believes that he or she has not been offered a sufficient sum in settlement of a claim for property damage may prevail under Hayseeds even though the insurer has committed no other transgressions.

2.

Because West Virginia's Hayseeds jurisprudence does not apply to actions under § 33-11-4(9), we note that a plaintiff need not substantially prevail on an underlying policy claim in order to enforce his or her rights under the statute. Indeed, one could conceivably argue that Continental acted more culpably (and offended the statute to a greater degree) by delaying settlement of the undisputed property damage claim than it did by denying outright the lost business income claim.

To be sure, if a plaintiff ultimately recovers less than the amount offered by the insurer in settlement of the underlying claim, there can be no violation of § 33-11-4(9)(g).[14] Nevertheless, no West Virginia case has held that a plaintiff's mere inability to prove a violation of Paragraph (g) precludes an attempt to demonstrate that an insurer has violated other provisions of the statute.[15] Hence, even had the district court applied the statute and concluded that Continental had not vio-

_____

[14] Because the manifest purpose of Paragraph (g) is to discourage the practice of "[c]ompelling insureds to institute litigation," only offers of settlement that are made prior to the commencement of the lawsuit may be compared to the plaintiff's ultimate recovery for the purpose of determining whether the Paragraph has been violated. Continental's post-complaint offer of judgment for $12,000 on the lost business income claim is not, therefore, relevant to the issue of whether it compelled Maher to bring suit to begin with.

[15] According to the bankruptcy judge's proposed Conclusions, Continental may have dealt with Maher in such a way as to run afoul of Paragraphs (a), (b), (e)-(g), (m), and (n). Continental may also have violated various provisions of the state's Regulations on Unfair Trade Practices, promulgated by the Insurance Commissioner of West Virginia.

13

lated § 33-11-4(9)(g), it could not have, as a result, dismissed the remainder of Maher's statutory claim.

B.

Until recently, it would have been appropriate for the district court to have dismissed Maher's statutory claim without prejudice until the appellate process had been concluded as to the underlying contractual claim. See Robinson v. Continental Casualty Co. , 406 S.E.2d 470, 471-72 (W. Va. 1991); Jenkins, 280 S.E.2d at 259.

However, in State ex rel. State Farm Fire & Casualty Co. v. Madden, 451 S.E.2d 721 (W. Va. 1994), the Supreme Court of Appeals of West Virginia overruled Robinson and Jenkins, holding that claims against an insurer under § 33-11-4(9) may be joined with an underlying third-party personal injury action against the insured, as long as the claims are bifurcated and proceedings against the insurer (including discovery) are stayed until the underlying claim has been ultimately resolved. Id. at 724-25. **16** Although the underlying claim in the instant case sounds in contract, not tort, and the suit is a "first-party" action by Maher against his own insurer instead of a third-party action by an outside claimant, the sweeping, unequivocal language used in Madden convinces us that it would apply with equal force here.

IV.

Accordingly, although we affirm the district court's entry of judgment for Maher on the underlying contractual claim, we vacate its dismissal of Maher's claim against Continental for unfair insurance settlement practices, and we remand the case to the district court to proceed with that claim. We direct that the court stay those proceed-

_____

**16** "Ultimately resolved" means that any and all appeals have been exhausted. Robinson, 406 S.E.2d at 471. Maher's appeals of the district court's judgment on the underlying claim will not have been exhausted until (1) the mandate has issued from this court, and either (2) the United States Supreme Court completes its review of the matter or (3) Maher declines to file a timely petition for certiorari.

14

ings, however, until Maher's underlying claim is ultimately resolved. See note 16, supra.

The judgment of the district court is

AFFIRMED IN PART, VACATED IN PART,

AND REMANDED WITH INSTRUCTIONS

15