Present:  All the Justices

ITT HARTFORD GROUP, INC.

OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record No. 982400                September 17, 1999

VIRGINIA FINANCIAL ASSOCIATES, INC.


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Herbert C. Gill, Jr., Judge

Traditionally, insurance products are marketed through independent agents selling directly to individuals or other single entities.  Such products also are sold using the technique involved in this case, Commercial Mass Marketing (CMM).  CMM, known as "affinity marketing," involves selling insurance products to groups the members of which have similar interests, or to a group association, instead of to individuals.

This litigation arose from a joint venture between two insurers, appellant ITT Hartford Group, Inc. (Hartford), with headquarters in Connecticut, and The Medical Protective Company (MedPro), based in Indiana.  The purpose of the venture was to create an insurance product, called "The Package," to be sold by CMM and tailored to the needs of dentists.

Appellee Virginia Financial Associates, Inc. (VFA), a Virginia corporation based in Chesterfield County, acted as a "marriage broker" and introduced MedPro and Hartford in the spring of 1994.  VFA, a licensed insurance agency, served as liaison between Hartford and MedPro as their relationship

developed. The main actor for VFA was William Montgomery ("Monty") Dise, an insurance agent and "part-owner" of VFA. The Hartford employee with whom Dise dealt was James D. Sinay, among others.

A dispute over the compensation to be paid VFA for its part in the corporate marriage triggered this lawsuit. In September 1996, plaintiff VFA filed a motion for judgment, later amended, against defendants Hartford and Sinay. Plaintiff sought recovery of compensatory and punitive damages based upon "express or implied contract," "quantum meruit," and fraud. In a grounds of defense, defendants denied plaintiff was entitled to any recovery and asked for dismissal of the action.

The plaintiff alleged that in 1991 it entered into an agency agreement with Hartford regarding commissions to be paid it for sales of certain insurance products. The agency agreement specified the commission to be received by plaintiff when it insures a client through Hartford; it also permitted compensation, known as "override" commissions, for insuring clients in special programs such as CMM accounts, according to the allegations.

The plaintiff further asserted, in allegations admitted by defendants in the grounds of defense, that Monty Dise approached Hartford in the spring of 1994 with a proposal for providing workers' compensation insurance coverage for dentists to

complement an insurance package offered by MedPro containing other insurance coverages. MedPro had approximately 20,000 dentist clients to whom Hartford could "cross-sell" its workers' compensation insurance and other coverages, according to the admitted allegations. The plaintiff alleged, and defendants admitted, that Hartford entered a joint venture with MedPro, which ultimately led to development of The Package, a program for dentists including business and professional insurance coverages.

The plaintiff further alleged that the program conceived by plaintiff would benefit all parties: Hartford would acquire new customers; MedPro would retain its accounts, receive a commission from Hartford, and have ability to write new dental clients; and, plaintiff "would receive a two percent (2%) commission override on all premiums generated from sales of The Package."

The plaintiff further alleged that from April 1994 through August 1995, Dise and another officer of VFA, "with the express encouragement and approval of" Hartford's authorized representatives, developed and marketed The Package. The plaintiff's work in acting "as liaison between [Hartford] and other entities" included, according to the allegations, many hours of meetings and travel, telephone conferences, and document drafting as well as significant expenditures of

expenses. The plaintiff alleged that all the work was performed with Hartford's and Sinay's "explicit or implicit assurances that VFA would be compensated for its efforts in connection with The Package" at specific rates. These assurances were made, plaintiff alleged, "with the intent to induce VFA to continue its work on The Package and to induce VFA not to market MedPro and the program to another insurance company with which VFA had an agency contract. At the time the assurances to VFA were made, [Hartford] and Sinay had no intent to fulfill them."

The plaintiff further alleged that defendants "repeatedly assured" VFA it would be "significantly compensated for its work on The Package." Plaintiff asserted that on February 1, 1995, Sandra L. Shearer, an employee in Hartford's "commercial affinity department," asked Dise to request in writing the compensation VFA was seeking; Dise complied with the request. Responding for Hartford, Sinay telephoned Dise and said: "'Monty, do you trust me,'" plaintiff alleged. Plaintiff further asserted Sinay told Dise "that it was too early in the negotiations" for Hartford to commit to specific compensation in writing but that Dise should "trust" Hartford to handle the compensation issue "fairly." Plaintiff alleged it continued to work on The Package "instead of marketing MedPro and The Package with another insurer."

4

Plaintiff further alleged that it attempted to establish a direct relationship between Hartford and plaintiff's client, MedPro.  In April 1995, a meeting was held in plaintiff's Virginia office; attending were Dise and executives of the plaintiff, Hartford, and MedPro, according to the allegations. At this meeting, the plaintiff asserted, a "top" MedPro executive authorized Hartford "to put together a firm proposal for The Package which was to be presented at an August meeting between the parties."  "On short notice," according to the allegations, Hartford excluded plaintiff and Dise from the August meeting "and from any other participation in connection with The Package."  Plaintiff also alleged that in October 1995, at a meeting in plaintiff's Chesterfield County office, a Hartford executive offered to pay plaintiff a $100,000 "finder's fee"; the offer was refused.

In January 1996, Hartford and MedPro executed the joint venture agreement.  The venture's initial product was The Package, which combined Hartford's property, general liability and workers' compensation coverages with MedPro's dental malpractice coverage.

In the amended motion for judgment, plaintiff alleged it is entitled to recovery of commissions amounting to "a significant percentage" of what it says will be "tens of millions of dollars in premium payments" to be received on The Package.  The

5

plaintiff sought commissions on premiums generated during the initial five-year term of the joint venture agreement and during renewal periods of the coverage extending to at least the year 2015.

During a three-day jury trial, the plaintiff presented credible evidence supporting the foregoing factual allegations regarding the relationship of the parties; the work done by plaintiff, especially Dise, in acting as liaison between Hartford and MedPro; the discussions among the principals for the parties regarding plaintiff's campaign for compensation for its efforts; and the fact that plaintiff and Dise were excluded from the August meeting held after Hartford authorized formulation of a firm proposal involving MedPro for marketing of The Package.

In an attempt to prove its damages, plaintiff presented the testimony of Peter M. Redlich, of Lanexa, Kansas, who was qualified as an expert "[i]n the insurance industry to talk about the mass marketing area, what insurance companies do with mass marketing, the custom in the industry for mass marketing." The defendants did not object to Redlich's testimony on those subjects. Over defendants' objection, however, the trial court permitted Redlich also to testify as an expert "in the area of making premium projections for insurance products" and "as an expert in forecasting projections."

The case was submitted to the jury on plaintiff's claim against Hartford for breach of express and implied contract, on its claim of fraud against Hartford and Sinay, and on the issues of compensatory and punitive damages.

The jury found in Hartford's favor on the breach of express contract claim. It found against Hartford on plaintiff's claim based upon implied contract, and fixed compensatory damages at $5 million. The jury found against Hartford, but in favor of Sinay, on the fraud claim, fixing compensatory damages at $200,000 and punitive damages at $1 million. In entering judgment on the verdict, the trial court reduced the punitive damage award to $350,000, the sum permitted by Code § 8.01-38.1. Hartford appeals.

On appeal, Hartford says the "core issue" involves its contention that the trial court erred in permitting Redlich's testimony projecting future income from The Package upon which plaintiff's past and future compensation by way of commissions could be calculated. Relevant to this issue is the length of time the premiums reasonably can be expected to be generated, the amount of those premiums, and the rate of any commissions to which the plaintiff may be entitled.

Redlich had "been in the business of selling property and casualty insurance" for 28 years. Also, he had been "involved in mass marketing of insurance products," participating in over

7

twenty "affinity mass marketing accounts" in the last ten years. The preparation for Redlich's testimony involving projections included his review of the depositions of principals of both Hartford and MedPro, including Raymond F. Wise, Jr., all witnesses in the case. Wise, a Hartford employee, was the general manager of the special program center established at MedPro's headquarters in Fort Wayne, Indiana, to administer The Package. Formerly, Wise had been the director of commercial mass marketing for Hartford's western division. Redlich also had reviewed the agency agreement between plaintiff and Hartford as well as the joint venture agreement between MedPro and Hartford.

Redlich testified that "generally" a mass marketing program "could run 5, 10, 15, 20 years" and that one had "been on the books since 1935." Previously, he had been engaged in a mass marketing program with Hartford in which he "just brought them the account" and "was not allowed to do any sales, marketing, solicitation, underwriting," and he had been paid a four percent commission on new business generated in the program and four percent on renewal premiums. Redlich stated that "where you bring to an insurance company an affinity group and you serve as a liaison after the insurance company sells the product," commissions range from as low as one percent, when the agent is "doing absolutely zero," to as high as eight percent.

8

Redlich opined that the custom in the industry is to pay commissions on premiums generated from new business, and from renewal business for "[a]s long as the policies are still in force." He stated that, under the circumstances of this case, if an express contract between plaintiff and Hartford did not apply, a three to four percent "override" commission would be appropriate for merely bringing Hartford "the idea" and bringing the two parties together. He said: "I notice Mr. Dise asked for 2 to 2 ½ percent. That's certainly very minimal." Redlich stated payment of "flat fees" was not customary for the work plaintiff performed.

Turning to the "core issue," Redlich explained his method of making "projections of premiums." First, he said, "you need to know the population of the group" and then "you take an average of the premiums written . . . in the state or in the region." Multiplying the two figures, he said, produces a "total potential." This "potential" depends upon the strength of "the endorser" of the product, such as a statewide dental association. From this "potential," Redlich arrived at a "penetration" rate which he defined as the number of persons "you expect to be able to write in a course of the year and then in each year going on."

Next, according to Redlich, an evaluation of the strength of "penetration" of the affinity group must be made to determine

9

how "competitive your product is." Then, the renewal potential of the product must be determined in order to project the amount of renewal premiums to be expected. Redlich opined that the "penetration figure" should increase annually. He said: "Generally, the first few years of a program, you're going to have a lot of interest generated because that's when a good part of the marketing is done." Thereafter, he stated, the success of the first years "increases the faith of the population in the program and their willingness to participate and to buy the services that are being sold to them."

Next, he stated, a "retention rate" must be ascertained in order to determine how much premium income will be realized in future years. This, of course, must depend upon how long "the program would last."

Redlich presented a three-page exhibit, laden with calculations, demonstrating and summarizing his projections for the years 1996 through 2015. He drew heavily on projections for 1998-2000 made by Hartford's employee Wise, which were based on sales of The Package from 1996 through the time of trial in May 1998. Redlich altered Wise's numbers up or down as he developed assumptions for his own conclusions.

Redlich assumed: A total population of the group initially as 22,000 dentists; an average annual policy premium of $1,000; a "penetration rate" of 28% in 1998 and 1999, 42% in 2000, 52%

in 2001, and 65% during 2003 to 2015; and, that new premiums would be derived one-half from existing MedPro clients and one-half from new clients.  Redlich then estimated the renewal premiums by multiplying the total premiums from the previous year of his assumptions by a renewal retention rate, which he assumed would be 92%.  He then added the products of his assumptions and arrived at the sum of $369,572,106 for the total new and renewal premiums to be derived for The Package for the period 1996 through 2015.

The plaintiff sought recovery of commissions based on the $369 million figure reduced by the testimony of an accountant to present value.  The lowest commission rate assumed by the accountant was 2.5 percent.  The accountant figured the present value of that assumed rate of commission computed upon the $369 million figure to be $5,393,111 for the 20-year period.

The verdict of $5 million appears to be based upon the present value of a commission rate approximating 2% on that amount for the period.  Indeed, the jury first returned a verdict for a nonspecific sum.  It reported an award "in the amount of 2% of all existing premiums since inception of the program, as well as all new and renewal premiums written nationwide for as long as 'The Package' program exists."  As directed by the trial judge, the jury resumed its deliberations and returned a verdict for a specific sum.

11

On appeal, Hartford contends that the trial court erred in permitting Redlich to opine that plaintiff was entitled to a commission on the future premiums that Redlich projected The Package would generate over the next 17 years.  We agree.

Expert testimony "cannot be speculative or founded upon assumptions that have an insufficient factual basis.  Such testimony also is inadmissible if the expert has failed to consider all the variables that bear upon the inferences to be deduced from the facts observed."  Tittsworth v. Robinson, 252 Va. 151, 154, 475 S.E.2d 261, 263 (1996) (citations omitted).  See Code §§ 8.01-401.1 and -401.3.

Moreover, when expert testimony consists of an array of numbers conveying an illusory impression of exactness, on a subject in which a jury's common sense is tested in order to evaluate the array, scrutiny of expert testimony is especially important.  Tyger Constr. Co., Inc. v. Pensacola Constr. Co., 29 F.3d 137, 145 (4th Cir. 1994), cert. denied, 513 U.S. 1080 (1995), cited with approval in CSX Transp. Inc. v. Casale, 250 Va. 359, 366-67, 463 S.E.2d 445, 449 (1995).

And, a verdict based upon speculative expert testimony "is merely the fruit of conjecture, and cannot be sustained."  Stover v. Norfolk & W. Ry. Co., 249 Va. 192, 200, 455 S.E.2d 238, 243, cert. denied, 516 U.S. 868 (1995).

In the present case, Redlich attempted to project the plaintiff's lost income for 17 years in the future in a new business enterprise. When an established business, with a proven earning capacity is involved, evidence of the prior and subsequent record of the business is relevant to permit an intelligent and probable estimate of damages. But when, as here, a new business is involved, the rule is not applicable because such a business is a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages. Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc., 249 Va. 39, 50, 453 S.E.2d 261, 268 (1995). See Clark v. Scott, 258 Va. ___, ___, ___ S.E.2d ___, ___ (1999), decided today. The two-and-one-half-year history of the premium income from 1996 to May 1998 is insufficient in this case to qualify the business of marketing The Package as an established business.

In Maher v. Continental Cas. Co., 76 F.3d 535 (4th Cir. 1996), the court applied West Virginia law which, like that in Virginia, requires anticipated lost income to be proved with reasonable certainty. There, the plaintiff sought to prove lost future income by taking actual sales for the past three years, and using "the smallest annual growth rate in sales" to project future sales. Id. at 540. Affirming the trial court's

13

exclusion of such evidence, the Fourth Circuit pointed out that although the plaintiff "submitted historical sales figures for the relatively brief three-year period," the plaintiff "failed to conduct any scientifically valid surveys assessing the relevant future market" for the products.  Id. at 541.

Moreover, the court said, plaintiff's expert "is not an economist, and he did not purport to otherwise possess any expertise regarding economic forecasting.  Yet, in the absence of long-term sales figures, [plaintiff's] best hope of proving his lost business income with reasonable certainty was to produce sufficient economic data upon which an economist could posit a reliable prediction."  Id.  This is such a case.

Redlich was not an economist, he had performed no statistical studies, he had consulted no actuaries regarding premium calculations, and he had performed no market analysis.  In addition, he relied upon projections made by Hartford's employee Wise.  But Wise testified in his deposition that his estimates were "just very highly speculative," were a "guess," and that he was "hoping" the MedPro-Hartford relationship would last "continuously."

In sum, Redlich projected lost income for 17 years in the future for this new enterprise merely by using several variables (premium amounts, population sizes, penetration rates, and retention rates) that were completely divorced from economic

reality.  Employment of these projections resulted in a verdict based upon speculation and conjecture, and it cannot be sustained.

Next, Hartford contends the trial court erred in refusing to sustain a demurrer, in denying a motion for partial summary judgment, and in approving the fraud verdict and the award of punitive damages upon the grounds that the plaintiff had failed to allege and prove a cause of action based upon fraud.  We shall address only whether the fraud verdict was supported by clear and convincing evidence.  We hold that it was not.

The case was submitted to the jury on the theories of actual and constructive fraud.  The plaintiff has the burden of proving all the elements of fraud by clear and convincing evidence.  Evaluation Research Corp. v. Alequin, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994).  To sustain a claim of actual fraud, the plaintiff must prove a false representation, of a material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage. Id.  "Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it."  Id.  And, "'fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or

15

statements as to future events.'" Patrick v. Summers, 235 Va. 452, 454, 369 S.E.2d 162, 164 (1988) (quoting Soble v. Herman, 175 Va. 489, 500, 9 S.E.2d 459, 464 (1940)). See Lumbermen's Underwriting Alliance v. Dave's Cabinet, Inc., 258 Va. ___, ___, ___ S.E.2d ___, ___ (1999), decided today.

Also, the jury was instructed, without objection, that concealment of a material fact "knowing that the other party is acting on the assumption that no such fact exists is as much fraud as if existence of the fact were expressly denied" and that a party is under a duty to exercise reasonable care to disclose to the other subsequently acquired information that the party knows will make untrue or misleading a previous representation. See J & D Masonry v. Kornegay, 224 Va. 292, 296, 295 S.E.2d 887, 890 (1982) (quoting Clay v. Butler, 132 Va. 464, 474, 112 S.E. 697, 700 (1922)); Ware v. Scott, 220 Va. 317, 321 n.3, 257 S.E.2d 855, 858 n.3 (1979).

The plaintiff contends that when the facts are viewed in the light most favorable to it, as they should be, the jury could properly "find that Hartford fraudulently represented to VFA that it would receive override commissions. There was also an abundance of clear and convincing evidence that Hartford fraudulently failed to tell VFA that it intended to pay it a finder's fee for months after Hartford had made that decision." Further, plaintiff contends "there can be no question that after

Hartford had decided to pay VFA a mere finder's fee, it continued to assure VFA that it would receive an override commission for bringing MedPro to Hartford as a CMM opportunity."  Additionally, plaintiff argues that Hartford decided in June 1995 to pay plaintiff a finder's fee, "but continued to request Dise to provide assistance and to lead him to believe VFA would be paid a commission commensurate with industry practice . . . when its present intention clearly was NOT to compensate VFA with a commission."  We reject these contentions.

This is another situation that we have confronted before when the "moving party in the controversy is a disgruntled player in the rough-and-tumble world comprising the competitive marketplace."  Commercial Bus. Sys., Inc. v. Halifax Corp., 253 Va. 292, 294, 484 S.E.2d 892, 893 (1997).  The plaintiff, through Dise, saw an opportunity to earn substantial override commissions by constructing a corporate marriage between its client, MedPro, and Hartford, or any other insurer who would listen.  There was no effort by plaintiff at the beginning of this side courtship between plaintiff and Hartford to obtain any agreement in writing or orally from Hartford about compensation. Instead, Dise proceeded with efforts to bring about the joint venture and began a campaign to procure consent from Hartford to pay him commissions.  These efforts were pursued in earnest long

before the marriage of MedPro and Hartford was culminated in January 1996.

As Dise continued to press for commissions, never slowing his efforts to earn what he hoped would be substantial remuneration, there were statements that Dise would be treated "fairly" and with "trust." These were promises and statements about future events, and were not fraudulent.

Actually, the plaintiff seeks to convert a dispute occurring in the marketplace over what is "fair" compensation into a tort action for fraud. The alleged actionable conduct of Hartford and its agents did not amount to false representations, and the trial court erred in ruling to the contrary.

Finally, Hartford contends the trial court abused its discretion when it refused to permit its witness, Warren W. Pierce, to testify. Because this case will be remanded, and there may be another trial, we will address this issue.

Pierce, an attorney for Hartford who drafted the joint venture agreement, was called to testify about the intent of the parties and the meaning of the language in the "Renewal/Nonrenewal Provisions" of the agreement. That portion of the agreement provides:

> "If neither party gives written notice of its desire
> to renew this Agreement, or if only one (1) party
> gives written notice of its desire to do so, the
> Agreement shall automatically terminate on January 1,
> 2001. Any party desiring to renew this Agreement must

give written notice to the other.  Notice shall be deemed to be given when received and shall be made in accordance with Section XV (Notices) of this Agreement.  Notice may not be sent earlier than January 1, 2000 and must be given by June 1, 2000 to be effective.

If a party fails to give notice of its desire to either renew or nonrenew in accordance with this Agreement, the intent of the party that has given notice shall control.  If the notice given is of an intent to renew, the noncomplying party shall be liable to the other for monetary damages, attorneys fees and costs in lieu of specific performance.  The period of time for which damages may be computed shall be January 1, 2001 to January 1, 2006."

This term of the agreement, of course, is relevant to the question whether the plaintiff can establish a reasonable probability of The Package's renewal beyond an initial five-year period set forth in the agreement.  Pierce's testimony was proffered several weeks after the trial and the trial court allowed it to be made a part of the record.

This portion of the agreement is ambiguous and the trial court permitted the jury to consider extrinsic evidence in construing it.  Redlich, having examined the agreement, furnished his interpretation of the agreement in making the assumption that it likely would be renewed in 2001 and beyond.

Therefore, given the fact that a plaintiff's witness, a non-lawyer, had been permitted to interpret the agreement, the trial court abused its discretion in refusing to allow a defendants' witness, who drafted the agreement, to interpret it.

19

If the evidence develops in the same manner upon retrial, Pierce should be permitted to testify in accordance with the proffer.

Consequently, the judgment in favor of the plaintiff for compensatory damages based upon breach of an implied contract will be set aside, and the case will be remanded for a new trial limited to the issue of such damages on the implied contract (quantum meruit) claim against Hartford.  The judgment for compensatory and punitive damages based upon fraud will be set aside, and final judgment will be entered here in favor of Hartford on that claim.

<u>Reversed, remanded,</u>
<u>and final judgment.</u>

20