**AMERICAN MEDICAL IMAGING CORP., Appellant,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY.**

No. 91–1128.

United States Court of Appeals, Third Circuit.

Argued July 10, 1991.

Decided Nov. 26, 1991.

Barry M. Klayman (argued), Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for appellant.

Ronald B. Hamilton (argued), Jennifer Gallagher, Cozen and O'Connor, Philadelphia, Pa., for appellee.

Before STAPLETON, HUTCHINSON, and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

This case involves the interpretation of a "business interruption" clause in an insurance contract. Appellant, American Medical Imaging Corporation ("AMIC"), brought suit against Appellee, St. Paul Fire and Marine Insurance Company ("St. Paul"), for lost earnings and extra expenses allegedly owed under the policy. The district court granted summary judgment in favor of St. Paul. AMIC in its appeal argues that the district court resolved disputed issues of material fact and misconstrued the policy, and that summary judgment was therefore improper. We agree and will reverse the district court decision.

### I.

AMIC provides ultrasound testing services to physicians and health care institutions for the diagnosis of various diseases. The ultrasound procedures are performed at physicians' offices, joint venture sites, and other health care institutions. Scheduling, marketing, billing, and clerical functions are performed at AMIC's headquarters on Gibraltar Road in Horsham, Pennsylvania.

Early one morning in August of 1988, a fire at AMIC's headquarters resulted in smoke and water damage that allegedly made use of the facilities impossible. AMIC immediately rented space at an alternative site and relocated there the next day, securing telephone service by 1:00 o'clock in the afternoon. It did not return to its headquarters for approximately six weeks. During the period of relocation, AMIC had access to substantially fewer telephone lines than they had before the fire. In October of 1988, AMIC returned to its headquarters and resumed normal operations a few weeks later.

St. Paul had issued a commercial insurance policy to AMIC that was effective during the period of the fire and relocation. In addition to property damage coverage, the policy covered "lost earnings" and "extra expenses" incurred during a business interruption. The maximum amount recoverable for lost earnings and extra expenses under this provision was $500,000.

AMIC presented a claim for property damage that St. Paul has paid. AMIC also claimed $500,000 in lost earnings and extra expenses caused by the fire and relocation. The basis of this claim was an alleged substantial loss caused by the disruption of AMIC's telephone system. Because AMIC depended on that system for orders, scheduling, and preparation of written test reports, it claimed that the disruption of the system cost the company new and existing business. In a proof of loss statement sent to St. Paul, AMIC represented that its lost earnings amounted to nearly $1 million. The proof of loss also indicated that AMIC's extra expenses as a result of the relocation were $20,350.20. After St. Paul refused to honor the lost earnings and extra expenses claim, AMIC brought this action for $500,000 and for punitive damages under the Pennsylvania Unfair Insurance Practices Act.

St. Paul filed a motion for summary judgment. In that motion, St. Paul argued that the "cancellation of contracts" and "loss of market" exclusions in the policy barred AMIC's claim. In the alternative, St. Paul maintained that AMIC failed to submit a truthful proof of loss, which is a condition precedent to St. Paul's liability on the contract.

The district court granted summary judgment in favor of St. Paul. However, the court did not rule on the issues raised in St. Paul's motion. Instead, it held that the evidence that AMIC offered as proof of its lost earnings was "too speculative" and that AMIC could not establish damages with a reasonable degree of certainty. In addition, the district court concluded that AMIC's business operations had not been suspended within the meaning of the policy. As a result, the lost earnings and

extra expenses claim failed, and St. Paul was entitled to judgment as a matter of law.

The district court had subject matter jurisdiction in this case under 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $50,000. We review the final judgments of the district courts pursuant to 28 U.S.C. § 1291. In cases where the district court has granted summary judgment, our review is plenary.

## II.

■ Initially, we address the question of whether AMIC suffered a "necessary or potential suspension" of operations within the meaning of the insurance policy. The policy states:

> We'll pay your actual loss of earnings as well as extra expenses that result from the necessary or potential suspension of your operation during the period of restoration caused by direct physical loss or damage to property at a covered location. The loss or damage must occur while this coverage is in effect and must be due to a covered cause of loss.
>
> We'll pay your earnings and extra expense loss from the date the property is damaged until the earliest of the following:
> • the date you resume normal business operations;
> • as long as it should reasonably take to repair, rebuild or replace the damaged property, plus 30 consecutive days; or
> • 12 months, regardless of your policy's expiration date.

App. at 15A.

Although the policy does not define "necessary or potential suspension," it does define "operation" to mean "the kind of business activities that occur at the covered location." Because AMIC conducted the same *kind* of business activities at its replacement facility, the district court concluded that these two provisions of the policy, read together, indicate that AMIC's alleged loss is not a covered one. *American Medical Imaging Corp. v. St. Paul Fire and Marine Insurance Co.*, No. 90–3677, slip op. at 8, 1991 WL 8885 (E.D.Pa. Jan. 24, 1991).

In response to St. Paul's summary judgment motion, AMIC established that it had evidence tending to show the following: (1) at the normal opening of business on the day following the fire, damage to the property made it impossible for AMIC to continue its business at its Gibraltar Road office; (2) faced with its inability to function at its fire-damaged location, AMIC promptly made temporary arrangements for alternative space and secured telephone service, albeit unsatisfactory service, at 1:00 p.m. on the afternoon after the fire; (3) in the course of making these alternative arrangements, AMIC incurred extra expenses; and (4) primarily because of the reduced telephone capacity at the temporary location, AMIC earned less from its activities than it would have doing business as usual in its Gibraltar Road location.

If a trier of fact believes AMIC's evidence, we conclude that the alleged loss would be a covered one. According to its version of the facts, AMIC experienced a "necessary suspension" of its business operations briefly on the morning following the fire. Moreover, on that morning, it faced a "potential suspension" of a much longer duration. Fortunately for AMIC and St. Paul, AMIC acted promptly to mitigate its loss and managed to make arrangements to conduct its business on a scaled-down basis at an alternative site. As a result of that "necessary suspension" and that "potential suspension," St. Paul was required to indemnify AMIC for any lost earnings or extra expenses arising from such suspensions during the period up to the date upon which AMIC was able to resume its normal business operations at the Gibraltar Road site, i.e., the covered location.

Under the district court's construction of the policy, the insured would have no motivation to mitigate its losses. Continuing in business at any level would bar recovery because the insured would be carrying on the same *kind* of activities that occurred at the covered location. We decline to accept

the suggestion that this was the intent of the parties. Indeed, other provisions of the policy bear witness to a contrary intent. For example, the policy imposes on the insured an affirmative duty to mitigate its losses:

> If you can reduce your loss by resuming operations at the covered location or elsewhere by using damaged or undamaged property ... you agree to do so.

App. at 16. Under the district court's reading, this provision would have imposed upon AMIC a duty, the performance of which would have forfeited its right to recover under the policy. We are confident that such an anomalous result was not intended and choose to read the policy terms regarding St. Paul's duty to indemnify as consistent with AMIC's duty to mitigate. Moreover, as appears from the earlier quoted portion of the policy, St. Paul's obligation to indemnify continues until the resumption of "normal business operations." This necessarily implies that the obligation to indemnify can arise while business continues, albeit at a less than normal level. App. at 15A.

### III.

■ The district court's alternative basis for its summary judgment favoring St. Paul was its conclusion that AMIC's evidence of "lost earnings" and "extra expenses" was too speculative to support a recovery. We again disagree.

We note at the outset that the existence in the record of any evidence on AMIC's loss or the extent thereof is purely fortuitous. Because St. Paul's summary judgment motion did not point to proof of loss as an area in which AMIC's evidence was fatally deficient, there was no reason for AMIC to put *any* evidence of loss in the summary judgment record. Because AMIC had no notice of, and no opportunity to develop a record on, this basis for the summary judgment against it, that judgment could not stand in the face of an objection by AMIC. Fed.R.Civ.P. 56;

*Davis Elliott Int'l, Inc. v. Pan Am. Container Corp.,* 705 F.2d 705, 707 (3d Cir. 1983). *See also Powell v. United States,* 849 F.2d 1576 (5th Cir.1988).

AMIC does not complain before us, however, regarding the absence of notice or an opportunity to develop the record regarding its alleged losses. Rather, it takes the position that the evidence fortuitously in the record is more than sufficient to raise a material dispute of fact. First, AMIC points to evidence that, as a result of the interruption of its business, it paid (1) rent for its alternative office space, (2) extra compensation for overtime work, and (3) excess telephone charges. This evidence of extra expenses [1] incurred by AMIC is alone sufficient to foreclose summary judgment for St. Paul based on the record regarding AMIC's losses.

■ AMIC points as well to evidence indicating that in the regular course of its business, AMIC's management had prepared income projections for 1988 based on the company's past performance and the business situation at the time the projections were formulated. AMIC's evidence indicates that in the past, these projections of future earnings have turned out to be very accurate estimates of actual performance. In 1986, for example, the variance between projected and actual revenues was .6%; in 1987, 1.1%, and in the first half of 1988, 2.8%. AMIC intended to show at trial, however, that actual revenues after the fire in mid–1988 fell far short of the revenues which had been predicted for that period. In this manner, AMIC intended to prove what it would have earned if there had been no suspension of its normal business operations.

The district court discounted this evidence of lost revenues as "purely speculative" and concluded that "AMIC's poor performance compels the conclusion that legal and economic forces totally unrelated to the fire, but detrimental to AMIC's service-oriented business, were at work in 1988 and 1989." Slip op. at 6–7. In addition,

---

1. The policy provides that "Extra expenses mean the necessary expenses you incur during the period of restoration that you wouldn't have incurred if there had been no direct physical loss or damage to property caused by a covered cause of loss." App. at 15A.

the district court expressed concern about AMIC's failure to tender proof of specific instances in which AMIC lost a sale, for example, testimony of doctors who would have ordered testing through AMIC but were unable to do so. Because in the district court's view AMIC was unable to prove its damages with reasonable certainty, no genuine issue of material fact existed and St. Paul was entitled to judgment as a matter of law.

Inherent in the concept of business interruption insurance is the necessity of insureds making claims for lost earnings based in large part on estimates of things that have not happened, i.e., on estimates of what would have happened had there been no fire or other covered cause of loss. Moreover, throughout the world of business, such estimates are invariably based on the results of past performance projected and adjusted on the basis of present business conditions. Indeed, St. Paul's policy itself states:

> Your amount of earnings loss will be determined based on:
>
> • *net income of your business before the direct physical loss or damage occurred;*
>
> • *the probable net income if no loss or damage had occurred;*
>
> • the operating expenses, including payroll expenses, necessary to resume operations with the same quality of service that existed just before the direct physical loss or damage; and
>
> • *other sources of information on your business such as: your financial records* and accounting procedures, bills, invoices and other vouchers and deeds, liens or contracts.

App. at 16 (emphasis supplied).

Unlike the district court, we find no fault with the *character* of AMIC's tendered evidence on lost earnings. Indeed, the fact that AMIC's projections were formulated in the regular course of business prior to the

alleged loss may commend them to the trier of fact as more reliable than if they had been prepared after the fact for purposes of litigation. Moreover, we know of no rule requiring that evidence of lost earnings identify the particular customers and hypothetical transactions that would have produced revenues but for the fire or other covered loss.

While we find no fault with the character of AMIC's evidence, we, of course, express no opinion on whether that evidence should carry the day. There well may be flaws in its projections. Indeed, it may turn out that those projections are based on assumptions so unrealistic or uncertain as to make them unacceptably speculative. Moreover, it may well be, as St. Paul contends, that factors other than the interruption of AMIC's business are responsible for the difference between its projected revenues and the revenues it actually received. Given the offers of proof from the two sides on this issue, a reasonable jury could conclude that AMIC's loss (1) was entirely the result of the fire and relocation, (2) was entirely caused by a change in the business climate that is not covered by the policy, or (3) was caused by some combination of the two. We conclude only that AMIC's tendered evidence concerning lost earnings was sufficient to preclude summary judgment against it on that issue.

### IV.

St. Paul urges us to affirm the summary judgment of the district court on one of three alternative bases: the "cancellation of contracts" exclusion, the "loss of market" exclusion, and the alleged failure of AMIC to file a truthful, sworn statement of loss. We decline to do so.

St. Paul's argument concerning the "cancellation of contracts" exclusion is based on its erroneous view that no "necessary or potential suspension" of AMIC's business occurred.[2] As we have earlier noted, there

---

2. The relevant policy provision states:
   Loss of Earnings and Extra Expense exclusions

   \*    \*    \*    \*    \*    \*

The following exclusions also apply to Loss of Earnings and Extra Expense coverage.

   \*    \*    \*    \*    \*    \*

Cancellation of Contracts. *We won't cover any increase in loss that's caused by the sus-*

is a material dispute of fact on that matter and if AMIC's evidence is credited, both a necessary and a potential suspension occurred.

The "loss of market" exclusion of the policy states:

Delay—Loss of Market. We won't cover loss caused by delay, loss of market, loss of use, or any other indirect loss *not covered under Earnings and Extra Expense coverage.*

App. at 19 (emphasis added). This exclusion thus specifically states that it does not apply to losses covered under the "Earnings and Extra Expense coverage." The district court's task on remand will be to determine whether AMIC's claim comes within that coverage; if it does, this exclusion will be irrelevant.

██ The St. Paul policy requires, as many insurance policies do, that the insured submit a sworn statement of loss within 60 days of the damage. St. Paul argues that AMIC is barred from recovering because it has not met this requirement.

AMIC submitted two sworn statements of proof of loss. On October 13, 1988, in its initial statement, AMIC stated that the amount of loss was "to be determined." On August 14, 1989, it submitted a statement claiming extra expense of $20,350.20 and income loss of $939,107.00. Thus, AMIC claimed $500,000, the upper limit under the policy, from St. Paul. AMIC now claims that this statement underestimated the loss it incurred, although that is of little consequence given the policy limit.

St. Paul has not challenged the timeliness of the submission of the proof of loss.

It argues that the August 1989 submission was false. But in order to be successful on such a theory, St. Paul must show both prejudice and that AMIC submitted a false proof of loss willfully and knowingly and with intent to defraud St. Paul. St. Paul has neither proved nor attempted to prove either prejudice or willful deceit. A statement of loss has been filed, and any allegations of falsity, as well as prejudice and willfulness, present disputes of fact sufficient to defeat summary judgment.

## V.

We will reverse the judgment of the district court and remand for further proceedings consistent with this opinion.[3]

---

*pension, lapse or cancellation of any lease,* license, contract or order.
*However, if the suspension,* lapse or *cancellation results directly from the interruption of your business,* we'll cover any increase in a covered loss that affects your earnings. But we'll only pay for such increase during the period of restoration.
App. at 15.

3. St. Paul urges that we should at least sustain the district court's judgment with respect to AMIC's punitive damages claim under the Pennsylvania Unfair Insurance Practices Act. 40 Pa.

S.A. § 1171.1 & 42 Pa.C.S.A. § 8371. Both sides appear to agree that the punitive damages provision of this Act does not apply to conduct occurring before July 1, 1990. AMIC contends that St. Paul's bad faith denial of coverage first came after that date. St. Paul has not taken a position on when it first denied coverage, but maintains that any bad faith on its part would necessarily have occurred before July of 1990. We believe the district court should address this issue in the first instance and that it would be premature for us to entertain it during this appeal.