[No. B146226. Second Dist., Div. One. Nov. 1, 2002.]

DAVID BUXBAUM et al., Plaintiffs and Appellants, v.
AETNA LIFE AND CASUALTY COMPANY et al., Defendants and
Respondents.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.C.

436

**COUNSEL**

Buxbaum & Chakmak and Charles L. Zetterberg for Plaintiffs and Appellants.

Rudloff Wood & Barrows and G. Edward Rudloff, Jr., for Defendants and Respondents.

## OPINION

**MALLANO, J.**—A law firm sustained water damage that had the effect of reducing the number of hours billed to clients during the week after the flood. The firm made a claim under its business interruption insurance policy, asserting that, during the one-week period, its attorneys billed less than usual. The insurer offered to settle the claim on terms that the firm rejected. This lawsuit followed.

The trial court granted summary judgment in favor of the insurer. We conclude that summary judgment was proper because the law firm did not "suspend operations" within the meaning of the policy. Rather, it continued to operate, albeit at reduced capacity.

I

### BACKGROUND

Buxbaum & Chakmak is a law corporation with offices in Claremont and Newport Beach, California. On the weekend of Saturday, February 19, 1994, a water pipe broke at the Claremont office, flooding the premises. Monday, February 21, 1994, was Washington's birthday, and the office was closed. When employees arrived for work on Tuesday, February 22, 1994, they found that most of the floor was covered by two inches of water, the carpet was ruined, the walls and wallpaper were soaked, the furniture was wet, and the computer system had crashed due to moisture.

The law firm had a property/liability insurance policy with Aetna Services, Inc. The policy also provided coverage for loss of business income, commonly called business interruption insurance. On February 23, 1994, the firm submitted a property damage claim under the policy and, within a few months, Aetna paid the firm $5,160.40 on the claim.[1]

On June 6, 1994, John Chakmak, one of the firm's principals, wrote to Aetna, making a claim under the business interruption coverage for "[t]ime

---

[1] Several insurance companies are defendants-respondents in this action. The parties dispute which company issued the policy. The record does not provide an answer. For example, page 4 of the policy begins, "Thank you for choosing an Aetna policy." Page 8 of the policy states that Farmington Casualty Company is the insurer. For convenience, we refer to the insurers collectively as Aetna.

lost by attorneys due to water damage because of flooded office and necessary damage repair." On the firm's letterhead were the two office addresses and the names of seven attorneys. Attached to the letter was a list containing the names of three attorneys, the number of hours they had "lost" due to the flood, their hourly billing rates, and the total dollar amount of the loss, $6,805. The list made no reference to the firm's other attorneys, and the record is silent as to their work.

The business interruption coverage provided that "[the insurer] will pay for the actual loss of Business Income [the insured] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration.' " "Operations" was defined as "[the insured's] business activities occurring at the described premises." The coverage applied to the premises at both of the law firm's locations. But, unlike the Claremont office, the Newport Beach office apparently did not suffer any type of damage, and business continued there as usual. On appeal, the parties focus on whether there was a loss of business income at the Claremont office. Consistent with that approach, we use the terms "law firm" and "firm" to refer to the Claremont office only.

By letter dated July 12, 1994, Matthew Tait, an Aetna claims representative, informed Chakmak that "[y]our policy provides coverage for Business Income Loss which is Net Income (Net Profit or Loss Before Income Taxes) that would have been earned or incurred. The policy does not provide for 'lost time'; continuing normal operating expenses [is] an element to be considered when evaluating your Business Income Loss. Please provide us with documentation to support your Net Income loss."

During the next several months, Chakmak and Tait discussed the policy provisions and the information Aetna needed to process the firm's claims. On the property damage claim, Tait visited the firm's Claremont office on January 27, 1995, and learned that certain items, including the ruined wallpaper and paint damage, had not yet been repaired. Within two weeks, Tait completed his estimate to finish the repairs. On February 8, 1995, Aetna paid the firm $7,966.78. In total, Aetna paid $13,127.18 on the property damage claim.

On the business interruption claim, Tait retained Campos & Stratis, an accounting firm, for assistance. Robert Salata, a forensic accountant, was assigned to the matter. By letter to Chakmak dated January 27, 1995, Salata requested the daily time sheets from January through March 1994 for the three attorneys claiming a loss of time. Salata also requested a profit and loss statement for the 1993 calendar year.

On May 16, 1995, Chakmak informed Tait by letter that, in order to preserve the confidential and privileged information of the firm's clients,

certain information would have to be redacted from the time sheets, namely, the clients' names and the description of the services rendered. The following day, Chakmak mailed the redacted time sheets and the profit and lost statement to Salata. Over the next few months, Campos & Stratis contacted Chakmak with follow-up questions and obtained additional information.

In calculating lost income, Campos & Stratis first determined the average number of hours worked per day before the flood. Those figures were then compared to the actual number of hours worked after the flood. As it turned out, the time worked by each of the attorneys after the flood was close to or exceeded the average time worked in the weeks before the flood. Campos & Stratis concluded that the law firm had sustained a loss of income in the amount of $125.

On September 18, 1995, Campos & Stratis sent its report, which included various schedules of data, to Tait, who in turn forwarded the report to Chakmak. On March 28, 1996, Chakmak wrote to Tait, describing the report as "completely erroneous" because Campos & Stratis had categorized several hours of postflood work as time chargeable to a client ("billable" time) when it was actually spent on flood-related tasks such as cleaning up the office. Of course, the Campos & Stratis report was based on the law firm's redacted time sheets, which did not provide a description of the work performed.

To assist Campos & Stratis in reevaluating the business interruption claim, Chakmak submitted a new set of time sheets that, while not disclosing any client information, did provide a description of the services rendered. For example, the time sheets showed that on the Wednesday following the flood, one of the attorneys spent four hours on flood-related problems and about five hours on billable matters. In general, the time sheets reflected that kind of daily mix for all three attorneys.

With the more detailed time sheets, Campos & Stratis prepared a second report with revised schedules, showing a loss of business income totaling $3,220. In a transmittal letter to Tait, Campos & Stratis stated: "[P]lease be advised that we believe there are the following issues that need to be considered and evaluated: [¶] . . . Regarding the actual loss sustained: [¶] a) Did the insured really lose the time? [¶] b) Collectibility—Typically a firm does not collect 100% of the amount billed. What percentage of the amounts billed are actually collected? That amount should be applied to the calculated fees lost."

On May 8, 1996, Tait sent Chakmak the revised schedules. On May 24, they spoke by telephone, discussing the firm's claim for lost income. Tait offered to settle the matter for $3,220.

By letter dated June 7, 1996, Chakmak informed Tait that the firm disagreed with Aetna's interpretation of the insurance policy. On June 25, 1996, Tait sent Chakmak a letter, stating: "There has been and continues to be some question regarding the actual business . . . loss sustained. Nevertheless, in good faith, we have attempted to adjust this portion of your claim based on information and documentation you have provided us. The most we have been able to estimate owing for your loss of business income, giving your claim every reasonable benefit of the doubt is $3,220 . . . . Enclosed is a check reflecting this amount as payment for this portion of your claim." On August 20, 1996, Chakmak returned the check by mail.

Tait wrote to Chakmak again on October 23, 1996, stating: "[A]s you previously have been advised, [Aetna] reserves all rights and defenses that it has or that may arise under the [insurance] policy and/or California law. Neither the writing of this letter, nor any actions taken by [Aetna] and/or its authorized representatives in connection with the . . . policy, shall constitute or be deemed to be a waiver of . . . any of the rights and defenses it may have . . . ." Chakmak quickly responded with a letter of his own, reserving all rights and claims on behalf of Buxbaum & Chakmak. Finally, on November 27, 1996, Tait sent Chakmak a replacement check for $3,220, assuring Chakmak that it could be cashed without prejudice to the law firm's rights. The check was not returned.

On July 10, 1997, Buxbaum, Chakmak, and the firm (collectively the law firm or the firm) filed this action against Aetna and Tait (collectively Aetna), alleging two causes of action: (1) breach of the duty of good faith and fair dealing and (2) violation of the California unfair competition law (Bus. & Prof. Code, §§ 17200-17209). After a series of demurrers, the firm filed a third amended complaint on September 11, 1998, alleging the same two causes of action.

On February 1, 1999, Aetna filed a motion for summary judgment or, in the alternative, for summary adjudication of issues, arguing that it did not withhold benefits due under the policy, and, even if it did, there was a reasonable basis for doing so. On March 3, 1999, the law firm filed a motion for summary adjudication, asserting that it was entitled to $6,805 in lost business income, not the $3,220 offered. The parties filed opposition papers and reply briefs on the cross-motions.

On July 30, 1999, the trial court heard argument. By signed order dated December 21, 1999, the court granted Aetna's summary judgment motion and denied the firm's motion for summary adjudication. Judgment was entered accordingly. The firm filed a timely appeal.

II

DISCUSSION

 Based on the principles governing summary judgment and the substantive law applicable to the law firm's claims, we conclude that the business interruption coverage did not apply because the firm did not "suspend operations," that is, it never ceased all business activities at its premises. We also conclude that the claim under the California unfair competition law is without merit. Accordingly, we affirm the judgment.

A. *Summary Judgment*

A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

 " 'A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed.' . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. . . . In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true." (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178-179 [70 Cal.Rptr.2d 96], citations omitted.)

 "In an action on an insurance policy . . . , it is well settled that '[t]he burden is on an insured to establish that the [event] forming the basis of its claim is within the basic scope of insurance coverage. . . .' " (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1071 [124 Cal.Rptr.2d 142, 52 P.3d 79].) "[The way in which] the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* [party] would bear *what*

burden of proof at trial." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851 [107 Cal.Rptr.2d 841, 24 P.3d 493], italics in original.) ■ And the standard of review on a summary judgment motion is the same for a summary adjudication motion. (See *Lomes v. Hartford Financial Services Group, Inc.* (2001) 88 Cal.App.4th 127, 131 [105 Cal.Rptr.2d 471].)

■ "The interpretation of an insurance policy is a question of law. . . . [¶] Hence, summary judgment is often an appropriate procedure for obtaining the court's interpretation of the policy. 'Even where a factual dispute exists, this will not preclude entry of summary judgment (on interpreting a policy) unless that fact is material.' " (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 15:699, p. 15-115, italics omitted.) Further, " '[w]e are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale.' " (*Mancuso v. Southern Cal. Edison Co.* (1991) 232 Cal.App.3d 88, 95 [283 Cal.Rptr. 300].)

## B. *Covenant of Good Faith and Fair Dealing*

■ A "bad faith" claim against an insurer is based on a breach of the implied covenant of good faith and fair dealing, which "exists to assure the insurer makes prompt payment of claims to the insured. The substance of a bad faith action in . . . first party [cases] is the insurer's unreasonable refusal to pay benefits under the policy." (*Gourley v. State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 127 [3 Cal.Rptr.2d 666, 822 P.2d 374].) " '[A] bad faith claim cannot be maintained unless policy benefits are due . . . .' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

■ "Insurance policies are contracts and, therefore, are governed in the first instance by the rules of construction applicable to contracts. Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation. . . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. . . . The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' controls judicial interpretation unless 'used by the parties in a technical sense, or unless a special meaning is given to them by usage.' . . . If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning. . . ." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666-667 [42 Cal.Rptr.2d 324, 913 P.2d 878], citations omitted.) "The fact that a term is not defined in the polic[y] does not make it ambiguous." (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265].)

As pertinent here, the policy provides: "[The insurer] will pay for the actual loss of Business Income [the insured] sustain[s] due to the necessary *suspension of [its] 'operations'* during the *'period of restoration.'* The suspension must be caused by direct physical loss of or damage to property at the premises described in the Declarations . . . caused by or resulting from any Covered Cause of Loss." (Italics added.)

"Operations," as defined in the policy, means "[the insured's] business activities occurring at [its] premises." "Period of restoration" is "the period of time (not exceeding 8 months . . . or 12 months [depending on the coverage purchased]) that: [¶] 1. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and [¶] 2. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality."

The policy further states that "[i]n the event of loss under this coverage [the insured] must resume all or part of [its] 'operations' as quickly as possible [and] [¶] . . . [¶] . . . [i]f [it] do[es] not resume 'operations,' or do[es] not resume 'operations' as quickly as possible, we will pay based on the length of time it would have taken to resume 'operations' as quickly as possible." Finally, the insurer "will reduce the amount of [the insured's] [¶] . . . Business Income loss . . . to the extent [the insured] can resume [its] 'operations,' in whole or in part, by using damaged or undamaged property . . . at the described premises or elsewhere."

In general, "[b]usiness interruption coverage operates to compensate the insured for losses stemming from the business interruption: lost profits, loss of earnings, and continuing expenses during the period of repair or restoration of property damaged or destroyed by reason of a covered peril." (11 Couch on Insurance (3d ed. 1998) § 167:9, p. 167-14.) "Coverage may extend for a reasonable period required to effect repairs." (*Id.*, § 167:18, p. 167-23; see Annot., Business Interruption Insurance (1996) 37 A.L.R.5th 41, 213-217, §§ 46-48 [collecting cases].) An insured "is entitled to recover its actual loss of business income during the period of time necessary to restore the business [premises]." (*Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.* (S.D.Fla. 1997) 958 F.Supp. 594, 602.) "Business interruption insurance is intended to return to the insured's business the amount of profit it would have earned had there been no interruption of the business ('suspension of operations')." (*Id.* at p. 603.)

In *Home Indem. Co. v. Hyplains Beef, L.C.* (D.Kan. 1995) 893 F.Supp. 987, a case involving a business interruption policy virtually identical to the

one before us, the court explained: "In order for business income coverage to apply, the Policy requires that there be a 'necessary suspension' of operations. This term is not defined in the policy. . . . [¶] Webster's Third New International Dictionary defines 'suspension' as 'the act of suspending or the state or period of being suspended, interrupted, or abrogated.' 'Suspended' is defined as 'temporarily debarred, inactive, inoperative.' These definitions comport with what appears to be the common understanding of the term 'suspension', that is, that it connotes a temporary, but *complete, cessation* of activity. Thus, if one were to apply the plain, ordinary meaning to the use of the phrase 'necessary suspension' within the policy, in order for a claim to fall within the coverage provision it would require that any direct physical loss of or damage to property result in the cessation of [the insured's] operations. Further, in looking at the policy as a whole, the court does not find any other provisions that would indicate that the use of the phrase 'necessary suspension' in the coverage provision should be given anything other than its common, ordinary meaning.

"[T]he policy does not provide coverage for a slowdown or reduction in operations, rather it requires a 'necessary suspension' of operations. [The insured in this case] does not controvert the fact that its . . . operations continued throughout the period that the [physical loss] existed, albeit at a reduced level of efficiency from what normal operations would have been. . . .

"The court's holding here, that a *complete cessation* of [the insured's] business was required to trigger coverage under the Business Income coverage provision, is consistent with the vast majority of cases from other jurisdictions that have examined the question of what constitutes a 'suspension' or 'interruption' of operations for the purposes of business interruption insurance. [Citations.]" (*Home Indem. Co. v. Hyplains Beef, L.C., supra,* 893 F.Supp. at pp. 991-992, italics added.) Another court has described the term "necessary suspension" as "unqualified language [that] unambiguously refers to a *total cessation* of [the insured's] business activities." (*American States Ins. Co. v. Creative Walking, Inc.* (E.D.Mo. 1998) 16 F.Supp.2d 1062, 1065, italics added, affd. mem. (8th Cir. 1999) 175 F.3d 1023.)

As one of our own court's recognized some time ago: "[T]he purpose and nature of 'business interruption' . . . insurance is . . . 'to indemnify the insured for any loss sustained by the insured because of his *inability to continue* to use specified premises . . . [, that is,] for loss caused by the interruption of a going business consequent upon the destruction of the building, plant, or parts thereof . . . .' " (*Pacific Coast Engineering Co. v. St. Paul Fire & Marine Ins. Co.* (1970) 9 Cal.App.3d 270, 275 [88 Cal.Rptr. 122], citation omitted, italics added.)

The Aetna policy provides that "[i]n the event of loss under this coverage [the insured] must resume all or part of [its] 'operations' as quickly as possible." "[T]he plain meaning of the word 'resumption' in the Policy indicates that for the provision to apply there must have necessarily been a stoppage of operations from which it was necessary to begin anew." (*Home Indem. Co. v. Hyplains Beef, L.C., supra,* 893 F.Supp. at p. 993.) "[T]here could be no 'resumption' if the insured never stopped doing business." (*Quality Oilfield Pro. v. Michigan Mut. Ins.* (Tex.Ct.App. 1998) 971 S.W.2d 635, 638.) "By requiring the insured to mitigate the loss and resume operations as soon as [possible], the [policy] implies that a business interruption loss has forced the insured to cease business operations." (*Keetch v. Mutual of Enumclaw Ins. Co.* (1992) 66 Wash.App. 208, 212 [831 P.2d 784, 787].)

We think it helpful to examine how courts have applied business interruption insurance in various circumstances. For instance, in one case, the theft of engineering drawings, computer discs, and design information from a manufacturer of oilfield equipment did not cause a suspension of operations because, while the "theft . . . adversely impacted . . . production, . . . [the company] remained open and continued to do business . . . at a rate of eighty percent of its previous level of capacity . . . ." (*Quality Oilfield Pro. v. Michigan Mut. Ins., supra,* 971 S.W.2d at p. 639.)

Where a motel experienced a drop in income after the 1980 eruption of Mount St. Helens, which covered the motel in six inches of ash, there was no suspension of operations because the motel stayed open, and the "same number of rooms [was] available both before and after the eruption." (*Keetch v. Mutual of Enumclaw Ins. Co., supra,* 66 Wash.App. at p. 212 [831 P.2d at p. 786].)

Water damage did not result in a suspension of operations where one of several stores in a retail clothing chain was damaged, the damaged store remained open, clothing from two other stores was diverted to the damaged store, and sales there actually increased, though at a rate lower than projected. As the court explained: "Here there was no actual suspension of business operations . . . , but rather an alleged adverse effect on continuing sales not only at the store suffering the physical damage . . . but at two other stores from which merchandise allegedly intended, was diverted to [the damaged store]. No basis is shown for including any loss allegedly sustained in the two other stores. A business judgment was made to divert the merchandise intended for those stores. Plainly the policy . . . was not intended to include business interruption, if any, to these other stores where no physical damage occurred. [The store] where the damage occurred, had an increase in sales." (*Howard Stores Corp. v. Foremost Ins. Co.* (1981) 82

A.D.2d 398, 401 [441 N.Y.S.2d 674, 676], citation omitted, affd. mem. (1982) 56 N.Y.2d 991 [453 N.Y.S.2d 682, 439 N.E.2d 397].)

A fire that destroyed one of three adjacent apartment buildings, which had formed an integrated complex, did not cause a suspension of operations in the two undamaged buildings regardless of a decrease in occupancy. "Even if the character of the apartment complex was adversely impacted by the fire, there was no 'necessary suspension of operations or tenancy' in [the remaining buildings, where the rooms were habitable]." (*Royal Indem. Ins. Co. v. Mikob Properties, Inc.* (S.D.Tex. 1996) 940 F.Supp. 155, 160.)

The destruction of a hotel restaurant by fire did not constitute a suspension of operations with respect to adjacent hotel buildings because "the hotel operation was able to accommodate the same number of patrons, albeit their actual number of customers may have been reduced." (*Ramada Inn Ramogreen, Inc. v. Travelers Indem. Co.* (11th Cir. 1988) 835 F.2d 812, 814; accord, *Hotel Properties v. Heritage Ins. Co.* (Fla.Dist.Ct.App. 1984) 456 So.2d 1249.)

The theft of merchandise from a retail store was not a business interruption but only a loss of business or diminution in volume. (*Rothenberg v. Liberty Mutual Insurance Company* (1967) 115 Ga.App. 26 [153 S.E.2d 447].) "The coverage afforded . . . does not extend to loss of profits that might have resulted from a sale of the goods taken in a burglary." (*Id.* at p. 28 [153 S.E.2d at p. 448].)

Where a snowstorm reduced attendance at a children's exposition, there was no coverage for lost revenue. (*National Children's Expositions Corp. v. Anchor Ins. Co.* (2d Cir. 1960) 279 F.2d 428.) "Had the snowstorm . . . rendered any portion of the building unusable and prevented the holding or continuance . . . of part of the exposition, the policy would cover any partial loss resulting therefrom. . . . The loss did not result from inability to hold the exposition in any part of the insured premises, but solely from a reduction in attendance." (*Id.* at p. 430.)

Turning to the facts of the present case, the law firm claims a loss of income for the week following the flood. The claim is limited to the work of three attorneys, whom we shall designate by their initials. The firm submitted the time sheets of Attorney CLZ for three days (Feb. 22, 23, and 24, 1994), Attorney DAB for one day (Feb. 22, 1994), and Attorney JPH for four days (Feb. 22, 24, 28, 1994, and Mar. 2, 1994). As noted, seven attorneys were listed on the firm's letterhead. The record contains nothing about the work of the other four attorneys, including Chakmak, so our analysis does not include them.

On February 22, 1994—the day the flood was discovered—Attorney CLZ spent six hours on flood-related problems and two hours 20 minutes on client matters; on February 23, he spent four hours on flood-related problems and four hours 45 minutes on client matters; and on February 24, he spent one and one-half hours on flood-related problems and seven hours on client matters.

As to Attorney DAB, on February 22, he spent six hours on flood-related problems and five hours on client matters.

Finally, as to Attorney JPH, on February 22, he spent six hours on flood-related problems and two hours 15 minutes on client matters; on February 24, he did not work at all; on February 28, he spent four hours on flood-related problems and three and one-half hours on client matters; and on March 2, he spent 30 minutes on flood-related problems and seven hours 35 minutes on client matters.

We know that the law firm measures income by billable hours and that Attorneys CLZ, DAB, and JPH devoted *some* of their time during the week after the flood to nonbillable, flood-related tasks. The firm is engaged in the business of providing legal services to clients, and, notwithstanding the flood, it did so without interruption. For instance, all three attorneys billed time on February 22, 1994, the first business day after the weekend flood. And although Attorney JPH did not bill any time on February 24, 1994, Attorney CLZ had seven billable hours that day.

The business interruption coverage focuses on an insured's "operations," which the policy defines as "[the insured's] business activities *occurring at the described premises.*" (Italics added.) In submitting its claim, the law firm did not assert that the water damage prevented attorneys from working *at the Claremont office* (or any other place for that matter). The time sheets show that there were billable hours on each of the days in question. Yet, the firm made no representation as to *where* the billable work was done, namely, in or out of the office. Rather, the firm disputed the formula to be used in calculating the amount of lost income.

As Aetna points out in its brief: "The 'operations' of the Law Firm never actually stopped during the week of February 22, 1994. Rather, the *time sheets* show that *each of the attorneys* claiming 'lost hours' . . . continued to work that week. . . . [¶] . . . [T]he evidence demonstrates that there was no

actual stoppage of the law firm's operations . . . and therefore no 'suspension' of operations took place." (Italics added.)[2]

In his declaration, David Buxbaum, one of the firm's principals, stated: "During the one-week period from February 22, 1994 to March 1, 1994, the [firm] could not carry on [its] *normal* business activities at the Claremont office due to the disruption caused by the water damage. . . . [¶] . . . [¶] . . . The [firm's] 'operations' at [the] Claremont office consisted of . . . the provision of legal services to clients. *Those business activities*, that is, the *normal* operations and functions of [the firm's] business, were *affected* beginning February 22, 1994 due to the water damage and the business activities *resumed* on March 1, 1994, when the 'necessary suspension of our operations' ended." (Italics added.) Chakmak submitted a declaration to the same effect.

We consider those declarations to the extent they contain evidence, not legal conclusions. (See *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1120 [75 Cal.Rptr.2d 27].) In that regard, a lack of "normal business activities" and a "disruption caused by the water damage" do not constitute "a total cessation of [the firm's] business activities." (*American States Ins. Co. v. Creative Walking, Inc., supra,* 16 F.Supp.2d at p. 1065; accord, *Home Indem. Co. v. Hyplains Beef, L.C., supra,* 893 F.Supp. at p. 991.) After the flood, the firm may have functioned at less than normal capacity and with less than normal resources, but it continued to operate nonetheless, as the time sheets indicate. Even if "*normal* operations" were "affected" on February 22, 1994, and "resumed" on March 1, 1994, the firm did not totally cease business activities at any point. And "the policy does not provide coverage for a slowdown or reduction in operations . . . ." (*Home Indem. Co. v. Hyplains Beef, L.C., supra,* 893 F.Supp. at p. 991.)

Nor does it matter that services for some of the firm's clients may have been delayed by the flood. "[B]usiness interruption insurance . . . provides coverage only for losses resulting directly from interruption of the business, i.e., operation of the [*firm*], and not merely from interruption of the work being done on . . . a particular [client matter] at the time of the occurrence of a peril insured against." (*Pacific Coast Engineering Co. v. St. Paul Fire & Marine Ins. Co., supra,* 9 Cal.App.3d at p. 275.) "If the insured's business as a whole continues, there is no coverage for interruption of work on a

---

[2]Aetna made this argument below in opposing the firm's motion for summary adjudication and in replying to an issue raised in the firm's opposition to Aetna's motion for summary judgment. As best we can tell, the firm did not address the argument in the trial court. On appeal, the firm has not discussed the specifics of the individual time sheets or any pertinent similarities or differences among them.

particular project." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 6:289.3, p. 6B-39, citing *Winters v. State Farm Fire and Cas. Co.* (9th Cir. 1995) 73 F.3d 224.)

Thus, as evidenced by the time sheets, the law firm continued to provide legal services after the flood and did not sustain a complete cessation of business at its Claremont office. Because there was no suspension of operations, the firm was not entitled to benefits under the policy.

Our conclusion is consistent with *American Medical Imaging v. St. Paul Fire & Marine* (3d Cir. 1991) 949 F.2d 690 (*American Medical Imaging*). In that case, a fire at the insured's headquarters resulted in smoke and water damage that made the facilities impossible to use. The insured immediately rented space at an alternative site and relocated there the day after the fire. The insured's business depended in large part on telephone communications. During the period of relocation, the insured had access to substantially fewer telephone lines, which caused a loss of income. The insured returned to its headquarters after six weeks and resumed normal operations a few weeks later.

The insured had business interruption coverage and submitted a claim for $1 million. Under the policy, the insured was to be paid for the "actual loss of earnings . . . that result[ed] from the necessary or potential *suspension of [its] operation* during the period of restoration . . . ." (*American Medical Imaging, supra*, 949 F.2d at p. 692, italics added.) Further, the insurer agreed to pay the insured's earnings from the date of the property damage to "the date [the insured] resume[s] normal business operations." (*Ibid.*) The policy defined "operation" to mean " 'the *kind* of business activities that occur at the covered location.' " (*Ibid.*, italics added.) The insurer denied the claim.

The insured filed suit against the insurer in federal court. The district court granted summary judgment for the insurer, finding that, because the insured had conducted the same *kind* of business activities at its permanent headquarters and its temporary facilities, there was no suspension of operations. The Third Circuit Court of Appeals reversed, stating:

"If a trier of fact believes [the insured's] evidence, we conclude that the alleged loss would be a covered one. According to its version of the facts, [the insured] experienced a 'necessary suspension' of its business operations briefly on the morning following the fire. Moreover, on that morning, it faced a 'potential suspension' of a much longer duration. . . . [The insured] acted promptly to mitigate its loss and managed to make arrangements to

conduct its business on a scaled-down basis at an alternative site. As a result of that 'necessary suspension' and that 'potential suspension,' [the insurer] was required to indemnify [the insured] for any lost earnings . . . arising from such suspensions during the period up to the date upon which [the insured] was able to resume its normal business operations at the . . . the covered location.

"Under the district court's construction of the policy, the insured would have no motivation to mitigate its losses. Continuing in business at any level would bar recovery because the insured would be carrying on the same *kind* of activities that occurred at the covered location. We decline to accept the suggestion that this was the intent of the parties. . . . [T]he policy imposes on the insured an affirmative duty to mitigate its losses: [¶] 'If you can reduce your loss by resuming operations at the covered location or elsewhere by using damaged or undamaged property . . . you agree to do so.' [¶] . . . Under the district court's reading, this provision would have imposed upon [the insured] a duty, the performance of which would have forfeited its right to recover under the policy. We are confident that such an anomalous result was not intended and choose to read the policy terms regarding [the insurer's] duty to indemnify as consistent with [the insured's] duty to mitigate. Moreover, . . . [the insurer's] obligation to indemnify continues until the resumption of 'normal business operations.' This necessarily implies that the obligation to indemnify can arise while business continues, albeit at a less than normal level." (*American Medical Imaging, supra,* 949 F.2d at pp. 692-693, italics in original.)

Although the wording of the business interruption insurance in *American Medical Imaging* differs somewhat from the language in the Aetna policy, both policies use the term "suspension of operation[s]." In *American Medical Imaging,* the insured ceased all business activities, if only for a brief time, the morning after the fire, when it relocated to temporary facilities. The Third Circuit so noted in reversing summary judgment for the insurer. (*American Medical Imaging, supra,* 949 F.2d at p. 692.) Thus, the holding in *American Medical Imaging* does not support the proposition that business interruption coverage may apply absent a complete cessation of operations. (See *Quality Oilfield Pro. v. Michigan Mut. Ins., supra,* 971 S.W.2d at p. 638; Carter et al., *Business Interruption Coverage: The Basics,* Practicing Law Inst. Litigation Administrative Prac. Course Handbook Series (Apr. 2002) 674 PLI/Lit. 33, 36-37; see also *Home Indem. Co. v. Hyplains Beef, L.C., supra,* 893 F.Supp. at pp. 992-993 [criticizing *American Medical Imaging*].) Here, the law firm did not stop all business activities, and *American Medical Imaging* therefore does not support its business interruption claim.

The decision in *Maher v. Continental Cas. Co.* (4th Cir. 1996) 76 F.3d 535 is a different matter. There, the rear storage area of a furniture store was

damaged by fire, but the store stayed open for business. The insurer denied coverage for lost business income on the ground that " 'suspension' mean[s] 'cessation'—a complete shutdown of the entire business." (*Id.* at p. 539, fn. 1.) The court rejected the insurer's interpretation, relying instead on the provision—common in business interruption policies—that the insured must " 'resume [its] 'operations,' in whole or in part, by using damaged or undamaged property . . . at the described premises or elsewhere.' " (*Ibid.*) The court concluded that the "resume operations" provision "contemplates that a policyholder may be compensated for lost income, regardless of whether the business *continued to operate* at a reduced level *immediately* following the covered loss." (*Ibid.*, italics added.)[3]

We disagree with *Maher* to the extent it suggests that, under a policy like the one before us, an insured can recover lost business income without having stopped business activities at its premises. As stated, a total cessation of business activity must occur. (See *Home Indem. Co. v. Hyplains Beef, L.C.,* *supra,* 893 F.Supp. at pp. 991-992; *Quality Oilfield Pro. v. Michigan Mut. Ins., supra,* 971 S.W.2d at p. 638; *Keetch v. Mutual of Enumclaw Ins. Co., supra,* 66 Wash.App. at pp. 210-212 [831 P.2d at pp. 786-787].) If the insured continues to operate despite physical damage, business interruption coverage does not apply. (See *Pacific Coast Engineering Co. v. St. Paul Fire & Marine Ins. Co., supra,* 9 Cal.App.3d at p. 275.) And "[a]n insured is not 'punished' by *continuing business* at a lower level following an event causing a physical loss or damage because, if in fact the insured is able to *continue business* following the event, the [business interruption] coverage never applied in the first place." (*Home Indem. Co. v. Hyplains Beef, L.C., supra,* 893 F.Supp. at p. 993, italics added.)

In sum, the cause of action here is for *bad faith* refusal to pay benefits. Because the law firm was not entitled to *any* benefits, Aetna did not breach the insurance policy, much less engage in bad faith conduct. Further, as noted, a business interruption policy typically requires a suspension of operations, that is, a total cessation of business activities at the insured's premises. Having experienced such a suspension, the insured is obligated to resume business activities at its premises or elsewhere as quickly as possible. Thereafter, to the extent the insured incurs a loss of business income, coverage may apply during the period of restoration.

---

[3]In *Maher*, the claims adjuster advised the insured to "keep the business open and sell the damaged goods at a discount." (*Maher v. Continental Cas. Co., supra,* 76 F.3d at p. 538.) Nevertheless, the court's analysis was based on an interpretation of the policy provisions, not the advice of the adjuster.

## C. *Unfair Competition Claim\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

### DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

Appellants' petition for review by the Supreme Court was denied January 15, 2003.

---

\*See footnote, *ante*, page 434.