NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0346n.06

Case No. 20-4090

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jul 16, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| HASTINGS MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| MENGEL DAIRY FARMS, LLC, | ) | |
| Defendant-Appellant. | ) ) | |

BEFORE: BATCHELDER, KETHLEDGE, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Will Mengel has been a dairy farmer for the past 20 years. He and his wife, Jennifer Mengel, manage commercial dairy farms in Pennsylvania and Ohio and care for over 1,000 cows. In 2018, disaster struck the farms when the Mengels' cows tragically started to die en masse. And the cows that didn't die began producing less milk. The Mengels spent months searching for a possible explanation—they tested the water for contaminants, consulted a nutritionist, and sought help from various experts. After running into a series of dead ends, the Mengels asked an electrician to investigate.

As it turned out, a stray electric current on the Mengels' property was electrocuting the cows. But it also turned out that the Mengels were prepared. They had insured their cows against a number of unlikely events—including accidental shooting, attack by wild animals, and, most relevant here, electrocution.

The Mengels submitted an insurance claim for the lost cows and reduced milk production. Their insurer, Hastings Mutual Insurance Company, paid for the loss of the cows, but it refused to pay for the reduced milk production. So the Mengels sued.

Under the insurance policy, Hastings Mutual must compensate the Mengels for the "loss of business income . . . due to the necessary suspension of [the Mengels'] operations." The Mengels argue that the reduced milk production (and the resulting loss in sales) qualifies as a "suspension" of their dairy farms' operations. But Hastings Mutual says that only a complete shutdown of the farms counts as a "suspension." The district court agreed with Hastings. It held that a "suspension" requires a "complete cessation of business activity." The Mengels now appeal.

We interpret the Mengels' insurance policy according to Ohio law. *See Hayes v. Equitable Energy Res. Co*., 266 F.3d 560, 566 (6th Cir. 2001). The insurance policy does not define the term "necessary suspension of [] operations," so we give the phrase its "natural and commonly accepted meaning." *U.S. Fid. & Guar. Co. v. Lightning Rod Mut. Ins. Co*., 687 N.E.2d 717, 719 (Ohio 1997) (citation omitted).

A "suspension" is commonly understood to mean a temporary—but complete—stop in activity. Webster's Third New International Dictionary describes "suspension" as "the act of suspending or the state or period of being suspended, interrupted, or abrogated." 2303 (Phillip B. Gove et al. eds., 2002). To "suspend," in turn, is "to cause (as an action, process, practice, use) to cease for a time [or] stop temporarily." *Id.* In short, a "suspension of operations" occurs when business operations are temporarily ceased.

Other courts agree. Though Ohio courts have never defined a "suspension of operations," several of our sister circuits read the phrase to require a complete shutdown of business operations. *See, e.g.*, *Apartment Movers of Am., Inc. v. One Beacon Lloyds of Texas*, 170 F. App'x 901 (5th

Cir. 2006) (holding that a "slow down in business" is not "a 'necessary suspension of []

operations'"); *Am. States Ins. Co. v. Creative Walking, Inc.*, 175 F.3d 1023 (8th Cir. 1999)

(summarily affirming the district court's holding that a necessary suspension "refers only to a total

cessation of business activity"); *Winters v. State Farm Fire & Cas. Co.*, 73 F.3d 224, 228–29 (9th

Cir. 1995); *see also Broad St., LLC v. Gulf Ins. Co.*, 37 A.D.3d 126, 130 (N.Y. 2006). *But see*

*Maher v. Cont'l Cas. Co.*, 76 F.3d 535, 539 n.1 (4th Cir. 1996) (noting in dicta that "suspension"

could cover reduced operations). While not binding, we consider it additional, persuasive evidence

that other courts also understand a "suspension of operations" to require a complete shutdown of

business activity.

The Mengels raise several arguments to the contrary, but none is persuasive. First, the

Mengels claim that some courts have interpreted "suspension" to include a lull in business. They

point to two cases: *Am. Med. Imaging* and *ICue Corp.*

Start with *Am. Med. Imaging*. Though the Mengels cite it for support, its logic cuts against

their interpretation. The policy at issue covered business losses stemming from a "necessary or

potential suspension" of operations. *Am. Med. Imaging Corp. v. St. Paul Fire & Marine Ins. Co.*,

949 F.2d 690, 692 (3rd Cir. 1991). The Third Circuit accepted the business's argument that it

suffered both a necessary and potential suspension. *Id.* It noted that the business experienced a

"necessary suspension" when a fire "made it impossible for [it] to continue its business." *Id.* By

contrast, the business experienced a "potential suspension" while it operated at a reduced capacity.

*Id.* Here, it is uncontested that the Mengels' dairy farms operated only at a reduced capacity.

(Neither party contends that it was impossible for the Mengels to continue their business.) As a

result, under *Am. Med. Imaging*, the Mengels' milk reduction would qualify only as a "potential

suspension." And since the Mengels' policy does not contain a "potential suspension" clause, their reliance on *Am. Med. Imaging* is misplaced.

As for *ICue Corp.*, it is a district court case based on a misreading of *Am. Med. Imaging*. The court held that under Third Circuit precedent "the term 'necessary suspension' should not be construed to require a total cessation of business operations." *ICue Corp. v. U.S. Fid. & Guar. Co.*, 2008 WL 11406046, at *1 n.1 (E.D. Pa. Apr. 23, 2008). But the only Third Circuit caselaw it cited was *Am. Med. Imaging*. And as discussed, *Am. Med. Imaging* did not give "necessary suspension" such an expansive reading. Rather, it recognized that a "necessary suspension" occurs when it's temporarily "impossible for [the insured party] to continue its business." *Am. Med. Imaging.*, 949 F.2d at 692. Because *ICue Corp.* is based only on misapplied caselaw, we decline to give it any weight.

Second, the Mengels argue that other provisions of the insurance policy contradict our reading of "suspension." For example, the policy provides that Hastings Mutual can reduce any benefits paid out for lost business income if the Mengels "can resume [] operations, in whole or in part." The Mengels claim this provision is proof that the term "suspension" can include a reduction in business: Since the policy continues to provide benefits if they partially reopen, it must also provide benefits if they only partially close. Not so. The provision establishes that benefits can be reduced only when a business can "resume" its operations. Yet in order for a business to resume operations, it must first *stop* operations. In other words, a business cannot restart something that never ended. So the provision does not support the Mengels' interpretation of "suspension."

The Mengels also point to Hastings Mutual's obligation to pay "any extra expense to avoid or minimize the suspension of business and to continue operations." But they offer no explanation

for how this provision supports their reading of "suspension." As a result, they've forfeited the argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

Third, the Mengels argue that Ohio law requires courts to construe insurance policies in favor of the insured party. *See Lane v. Grange Mut. Cos.*, 543 N.E.2d 488, 490 (Ohio 1989). But that rule applies only when the policy is ambiguous. *See id.* As discussed, the Mengels have advanced no other plausible interpretation of "suspension." *See Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) ("Ambiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations."). So the policy here is unambiguous.

Fourth, the Mengels argue that interpreting "suspension" narrowly would make the policy illusory. They claim that if the policy protects against only a complete cessation of business activity, it would be "virtually impossible" to qualify for coverage. And Ohio law counsels against interpretations that "render [an insurance policy] useless." *Talbert v. Cont'l Cas. Co.*, 811 N.E.2d 1169, 1177 (Ohio Ct. App. 2004). But while a business rarely may be forced to entirely close shop, the Mengels have offered no explanation for why it is *impossible*. Nor could they. Unfortunately, it is all too easy for a large-scale natural disaster like a tornado or wildfire to effectively (or literally) destroy a small business. Indeed, insurance is designed to protect against those kinds of unlikely but devastating events. The policy is not illusory.

Finally, the Mengels argue that Hastings Mutual previously covered business losses for a similar claimant. But it's not our job to police extra benefits or concessions Hastings Mutual gives to other customers. Our role is only to faithfully interpret Hastings Mutual's obligations under the policy before us. And that policy is unambiguous: A lull in business is not a "suspension of operations."

Litigation has a way of transforming common-sense questions into impenetrable legal mazes. But in this case, for once, the issues are just as they seem. A business suspends its operations when it temporarily stops all business activity. Though the Mengels' cows produced less milk, the Mengels never completely shut down their dairy farms. As a result, we affirm.