[659 NYS2d 273]

In the Matter of the Liquidation of IDEAL MUTUAL INSURANCE Co. SUPERINTENDENT OF INSURANCE OF THE STATE OF NEW YORK, as Liquidator, Appellant-Respondent; HARBOUR ASSURANCE COMPANY OF BERMUDA, LTD., Respondent-Appellant.

First Department, July 1, 1997

### APPEARANCES OF COUNSEL

*Mathias E. Mone* of counsel *(Emiliano Mazlen* on the brief; *Cahill Gordon & Reindel,* attorneys), for appellant-respondent.

*Roger E. Podesta* of counsel *(Mary Beth Hogan, Joseph T. McCullough, IV,* and *Neal J. Moglin* on the brief; *Debevoise & Plimpton,* and *Lovell White Durrant,* attorneys), for respondent-appellant.

### OPINION OF THE COURT

MAZZARELLI, J.

Every insurer authorized to do business in New York is

required to file an annual statement of its financial condition with the New York State Superintendent of Insurance (Superintendent) (Insurance Law § 307 [a] [1]). Under Insurance Law § 1301 (a) (14), an insurer may include, as an "admitted asset" on its financial statement, reinsurance recoverable from an authorized reinsurer, and in certain circumstances from an unauthorized reinsurer.

In late 1983, the New York State Department of Insurance adopted a regulation prohibiting New York insurers from taking credit on their annual financial statements for reinsurance obtained from unauthorized reinsurers,[1] unless adequate security was provided for such reinsurance (Department of Insurance Circular Letter 1983-19; see, 11 NYCRR 79.6, 79.2). This requirement would be satisfied by the issuance to the reinsurer of a "clean, irrevocable, and unconditional" letter of credit. At that time, Ideal Mutual Insurance Co. (Ideal) had existing reinsurance contracts with several unauthorized reinsurers whose letters of credit did not meet the regulation's standard. Pursuant to the new regulation, Ideal would not have been able to credit these reinsurance contracts to its loss reserves for the year 1983, and its financial condition would suffer accordingly.

Given this predicament, Ideal's vice-president Fred Packer approached the president of respondent Harbour Assurance Company (Harbour), Richard Casey, seeking temporary reinsurance coverage from Harbour until its existing unauthorized reinsurers obtained conforming letters of credit. Harbour, a reinsurance company licensed to do business in Bermuda, but not New York, was also subject to the new Department of Insurance regulation. In February 1984, the parties executed a "slip" agreement, which was intended to be superseded by a formal reinsurance contract. It never was. The "business covered" by the agreement was "[a]ll business written by [Ideal] as accounted for at December 31, 1983." The losses covered were "[u]npaid loss recoveries, outstanding loss reserves (including LAE & IBNR)[2] and unearned premium reserves applicable—to [Ideal's foreign] reinsurers." Harbour's liability was limited to paying the "aggregate excess" of all the losses unpaid by the unauthorized reinsurers, up to the $5 million policy limit.

---

1. "Unauthorized reinsurers" are those which are neither authorized nor accredited under the Insurance Law to do business in New York (Insurance Law § 107 [a] [2], [10]; § 1301 [a] [14]).

2. "LAE" stands for "loss adjustment expenses," i.e., attorneys' and adjusters' fees, and "IBNR" refers to "Incurred but not Reported" losses.

The slip agreement further provided that Harbour would supply a $5 million clean, irrevocable letter of credit to secure its reinsurance obligations, in exchange for Ideal's payment of a base annual premium of $108,300. The agreement was to be effective for a period of 12 months, commencing on December 31, 1983, and could be renewed. If either party elected not to renew the agreement, 15 days' notice to the other party was required. On March 21, 1984, Harbour established a $5 million letter of credit in compliance with the regulation, with the same duration as the slip agreement.

On October 7, 1984, Harbour notified Ideal that it would not renew the agreement after December 31, 1984, and on December 4, 1984, Harbour issued a formal notice of cancellation of the reinsurance contract. Ideal did not object to these notices, but rather requested a new letter of credit. It was placed in rehabilitation on December 24, 1984. On December 27, 1984, the Superintendent drew down the entire amount of Harbour's $5 million letter of credit. In February 1985, Ideal was found insolvent and placed into liquidation, with the Superintendent named as liquidator.

Harbour sought return of the $5 million proceeds of the letter of credit by filing with the Superintendent a proof of claim on February 3, 1986, and an amended proof of claim on February 6, 1990. Harbour argued that the Superintendent's actions were unjustified since it had no liability under the reinsurance contract and letter of credit. It asserted that the reinsurance policy was a "claims-made" policy, in which its liability was limited to claims of which it received notice during the policy period. Since it is undisputed that Ideal did not provide notice of any claims prior to the agreement's expiration on December 31, 1984, Harbour claims it is not liable for any amount. Harbour seeks return of the entire $5 million proceeds, plus interest.

In 1991, the Superintendent filed a petition with the court seeking dismissal of Harbour's claim on the ground that the reinsurance agreement was an "occurrence-based" policy, which covers losses occurring during the policy period regardless of when the claim is made. The Superintendent argues that the liquidator was entitled to draw down the entire $5 million letter of credit to cover any losses incurred by the unauthorized reinsurers during the policy period. Harbour cross-petitioned for summary judgment.

By order dated February 4, 1994, the IAS Court denied both the petition and cross petition. However, it made a finding that

the reinsurance policy was an "occurrence" contract, accepting the Superintendent's construction of the agreement. The Superintendent argued that the absence of a time-specific notice of claim provision in the slip agreement compelled the conclusion that notice was to be given within a "reasonable time" after the loss. It further asserted that the agreement was a "guarantee of collection" under which Ideal was obligated to exercise due diligence in attempting to collect from the unauthorized reinsurers before looking to Harbour for payment under the terms of the reinsurance contract. This obligation required Ideal to resort to litigation against the unauthorized reinsurers, to notify Harbour of its unsuccessful efforts at collection and to submit proof of such efforts. Since these notice and collection obligations were not subject to definite time periods, and most likely could not be completed within the one-year policy period, the Superintendent alleged that it would be practically impossible for Ideal to have provided notice of any claims during the policy period. Accordingly, the Superintendent concluded that the policy must be an occurrence-based policy rather than a claims-made policy. The IAS Court accepted this interpretation in its entirety.

■ The IAS Court erred in holding that the reinsurance agreement between the parties was an occurrence-based policy as a matter of law. Where the terms of an insurance policy are clear and unambiguous, they should be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement (*United States Fid. & Guar. Co. v Annunziata*, 67 NY2d 229, 232; *Amusement Consultants v Hartford Life Ins. Co.*, 214 AD2d 442, 443). However, where the policy is ambiguous and susceptible of two reasonable interpretations, extrinsic evidence may be admitted to resolve the ambiguity (*see, State of New York v Home Indem. Co.*, 66 NY2d 669, 671; *Starlo Fashions v Continental Ins. Co.*, 185 AD2d 114, 115-116).

The policy in this case was ambiguous on the crucial issue of whether it was a claims-made or occurrence-based policy. The slip agreement, the only writing memorializing the reinsurance arrangement, made no mention of which type of policy it was. This is not surprising since a slip, while binding, is merely intended to be an abbreviated, preliminary version of the policy terms (*see, Employers Commercial Union Ins. Co. v Firemen's Fund Ins. Co.*, 45 NY2d 608, 613). Given the absence of express "claims-made" or "occurrence" type language in the agreement, the parties, and the IAS Court, relied on inferences from the existing language to draw their conclusions. The court's

reliance on inferences rather than the words themselves to interpret this policy, shows, by itself, that this contract was not unambiguous on its face.

As Harbour argues, there is sufficient evidence within the four corners of the agreement, and other portions of the record, to create an issue of fact as to whether the slip agreement was intended to operate on a claims-made basis. The express one-year duration of the slip agreement and letter of credit, and the provision in the slip agreement authorizing Harbour to cancel the agreement after one year, both support Harbour's contention that its obligation to provide security for the unauthorized reinsurers' liability was not indefinite, and could be cut off after one year. This construction stands in stark contrast to the Superintendent's interpretation that the agreement contemplated diligent efforts by Ideal to collect from the unauthorized reinsurers well beyond the expiration date of the parties' agreement. Neither position is definitively established by the words of the agreement itself, and the IAS Court should have accepted extrinsic evidence to determine the parties' intent (*see, Levy v Keslow*, 213 AD2d 276; *Yanuck v Paston & Sons Agency*, 209 AD2d 207, 208). Accordingly, we remand this matter for a hearing to make such determination.

The Superintendent's remaining arguments on this point are meritless. Even if we accepted its characterization of the slip agreement as a guarantee of collection (*see generally, General Phoenix Corp. v Cabot*, 300 NY 87, 92 [guarantor of collection binds himself only after attempts to obtain payment from the debtor have failed]; *Federal Deposit Ins. Corp. v Schwartz*, 78 AD2d 867, 868, *affd* 55 NY2d 702), that would not establish the policy as occurrence-based. Although such an agreement would require collection efforts by Ideal, possibly extending beyond the policy's expiration, that would not prevent Ideal from providing notice of a claim to Harbour that such debt was uncollectible prior to the expiration date.

■ We come to a similar conclusion with respect to the Superintendent's appeal, seeking reversal of that portion of the IAS Court's order holding that Harbour's liability is limited to losses which occurred during the December 31, 1983 to December 31, 1984 policy period, and not before. The IAS Court was itself inconsistent on this issue. Harbour argues that even if the Superintendent's position that this is an occurrence-based policy is accepted, then by definition, the policy pertains only to losses which occur *within* the policy period. The Superintendent counters that since the very purpose of this reinsur-

ance agreement was to provide security for the reinsurance obligations of Ideal's unauthorized reinsurers, so as to permit Ideal to take credit for such reinsurance on its *1983* financial statement, it would make no sense for the agreement to exclude 1983 losses occurring prior to the inception of the agreement.

There is support for both of these positions in the abbreviated slip agreement. Thus, the agreement is ambiguous as to the period Harbour was liable for losses, and extrinsic evidence should be admitted at the hearing on this issue as well (*Yanuck v Paston & Sons Agency, supra*).

Accordingly, the order of the Supreme Court, New York County (Charles Ramos, J.), entered March 6, 1996, which granted respondent Harbour Assurance Company's motion to reargue an order of the same court and Justice, entered September 6, 1995, and upon reargument, reversed its determination that Harbour was liable for Ideal's losses which accrued prior to the commencement of the policy period, but adhered to its additional determination, reaffirming two prior orders, which, in denying both the Superintendent's motion to disallow Harbour's claim and Harbour's cross motion for summary judgment, found that the reinsurance policy at issue was an occurrence-based policy rather than a claims-made policy, should be modified, on the law and the facts, to the extent of vacating the findings that the policy was an occurrence-based policy, and that it covered only losses occurring during the policy period, and remanding this matter for a hearing, at which extrinsic evidence may be admitted, to determine which type of policy the parties intended, and whether the policy covered losses which occurred before its commencement, and otherwise affirmed, without costs.

SULLIVAN, J. P., MILONAS, NARDELLI and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered March 6, 1996, modified, on the law and the facts, to the extent of vacating the findings that the policy was an occurrence-based policy, and that it covered only losses occurring during the policy period, and remanding this matter for a hearing, at which extrinsic evidence may be admitted, to determine which type of policy the parties intended, and whether the policy covered losses which occurred before its commencement, and otherwise affirmed, without costs.