[832 NYS2d 1]

Broad Street, LLC, Respondent, v Gulf Insurance Company, Appellant.

First Department, December 12, 2006

### APPEARANCES OF COUNSEL

*Cozen O'Connor*, Philadelphia, Pennsylvania (*Joshua Wall* admitted pro hac vice, and *C. Tyler Havey* of counsel), and *Cozen O'Connor*, New York City (*Melissa F. Brill* of counsel), for appellant.

*Stewart Occhipinti, LLP*, New York City (*Frank S. Occhipinti* of counsel), for respondent.

### OPINION OF THE COURT

NARDELLI, J.

In this appeal, we are asked to determine the scope of the business interruption coverage afforded in a commercial property insurance policy issued by defendant Gulf Insurance Company to plaintiff Broad Street, LLC, the owner of a lower Manhattan building which was temporarily closed in the aftermath of the September 11, 2001 destruction and mass murder at the World Trade Center. At the core of this dispute is the meaning of the policy term "necessary suspension"; plaintiff asserts the term should be interpreted to mean the suspension of "normal business activities," whereas defendant submits the term is clear and unambiguous and is triggered only by a total interruption of business operations.

Plaintiff Broad Street, LLC (Broad Street) owns and operates the building designated as 25 Broad Street, New York, New York. The building, which is located approximately three blocks from the World Trade Center site, consists of 345 residential units and three commercial spaces. There is no dispute that following the events of September 11, 2001, the building was completely shut down from that day to September 18, 2001, at which time tenants were permitted back into their units. Plaintiff's staff, during the week the building was closed, cleaned the common areas, as well as the apartments, especially those with windows that had been left open, and replaced all of the air filters in the building.

There is also no dispute that a commercial property insurance policy was issued to plaintiff by defendant Gulf Insurance Company and covered the building at the time in question. The policy provides, in pertinent part:

"We will pay for the actual loss of Business Income

you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss of or damage to property at the premises described in the Declarations . . . caused by or resulting from any Covered Cause of Loss."

"Operations" is defined in the policy as "your business activities occurring at the described premises"; "period of restoration" is defined as the period that "[b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises" and "[e]nds on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality."

Plaintiff, by letter dated September 24, 2001, informed defendant that the building had sustained damage "in the form of smoke and soot in all common areas, building systems and apartments in addition to lost gas and steam service," and that the building had been evacuated from September 11 through September 17.* Plaintiff further stated that its business interruptions losses:

"are on-going as we have not resumed normal business operations. While some tenants have returned to the building, other [sic] have not. Normal business-life in the vicinity of our residential building has not resumed due to on going [sic] transportation limitations, street closures and limited deliveries.

"Moreover, utilities, including phone and cable, to the building continue to be interrupted. There are public health warnings related to air quality that continue during the clean up effort.

"All of this is not only disruptive to our existing tenancy, it is also seriously affecting our ability to rent vacant apartments and retail space."

The tenants of the building, through counsel, informed plaintiff, by letter dated December 28, 2001, that:

"The problems encountered by financial district

---

* Mr. Brendan Harte, the superintendent of the building, testified at an examination before trial conducted on February 12, 2004, that all of the building's utilities, including gas and hot water, were restored by September 17 or 18.

Residents are legion, and have been well documented by the media and in various legal actions: temporary ouster from their homes only to return to dust-filled apartments; the lingering, and potentially harmful, stench from Ground Zero that has caused many residents to experience respiratory or other complications with long-term effects yet to be determined; the morbid reality of a mass graveyard just a few blocks away."

Tenants' counsel further noted that due to security measures, streets in the area were closed to vehicles, and tenants had to walk a block or more to hail a taxi. Counsel concluded that the building and the area were no longer what the tenants had bargained for when they executed their leases and, as a result, sought, inter alia, a full rent credit from September 11 through September 30; a rent reduction from October 1, 2001 through September 30, 2002; an option to surrender the lease upon 30 days' notice; and monthly air- and water-quality testing. Plaintiff eventually provided a number of concessions to its tenants, including rent abatements or reduced rents to those who remained in the building.

Plaintiff subsequently commenced the within action by the service of a summons and complaint in August 2002, seeking coverage for the business losses it sustained up to the commencement of the action, which were purportedly in excess of $17 million, plus a declaratory judgment declaring that defendant is obligated to pay plaintiff's loss of business claims for the entire period of restoration.

Defendant answered the complaint and, after the completion of discovery, moved for partial summary judgment seeking an order: that under the terms of the policy, the period of restoration during which plaintiff is entitled to recover its actual loss of business income is from September 11, 2001 through and including September 17, 2001; that any loss of income sustained after September 17, 2001 is not within the policy coverage; and that any consequential damages are dismissed with prejudice. Defendant did not, and does not now, contest that its policy covered plaintiff's losses from September 11 through September 17, but asserts that under the unambiguous terms of the policy, in order to be covered, the business losses must occur during a "necessary suspension," which means a total cessation of plaintiff's business. Defendant argues that once tenants were permitted to return to the building after September 17,

plaintiff's claims no longer fell within the parameters of the policy.

The motion court denied defendant's motion, finding issues of fact as to whether plaintiff was prevented, after September 17, "from . . . providing functionally equivalent services to the residential tenants occupying apartments at the time of the attack." (9 Misc 3d 1119[A], 2005 NY Slip Op 51661[U], *4 [2005].) Defendant appeals and we now reverse.

Initially, we reject plaintiff's contention that defendant has waived its argument that the policy requires a complete cessation of operations for the full period of its business income loss in order to trigger coverage because it never raised this argument before the motion court. A review of the record reveals that defendant clearly and repeatedly argued that coverage for plaintiff's income loss was limited to the week-long period when plaintiff's operations were suspended; that when the building was opened, utilities were restored, and tenants were returning, plaintiff's operations could no longer be considered suspended; that coverage was only for the "necessary suspension of operations," in other words, once the insured has resumed operations, the required element of a "suspension of operation" is no longer present; and that this did not mean "normal operations," but only "necessary suspensions," which in this case lasted only until September 18.

In any event, this Court has the authority to reach the merits of defendant's argument, even if it were made for the first time on appeal, because such argument is clearly supported by facts already in the record (*DeRosa v Chase Manhattan Mtge. Corp.*, 10 AD3d 317, 319 [2004]; *Matter of New Hampshire Indem. Co. v Vranica*, 294 AD2d 287 [2002]). Further, as this Court has previously stated, the interpretation of an insurance policy is a question of law, which can be raised for the first time on appeal (*Star City Sportswear v Yasuda Fire & Mar. Ins. Co. of Am.*, 1 AD3d 58, 62 [2003], *affd* 2 NY3d 789 [2004]; *Lumbermens Mut. Cas. Co. v Schrem*, 227 AD2d 280 [1996]).

Turning to the merits of defendant's argument, our analysis begins with the well-established principles governing the interpretation of insurance contracts, which provide that the unambiguous provisions of an insurance policy, as with any written contract, must be afforded their plain and ordinary meaning, and that the interpretation of such provisions is a question of law for the court (*2619 Realty v Fidelity & Guar. Ins. Co.*, 303 AD2d 299, 300 [2003], *lv denied* 100 NY2d 508

[2003]; *Mazzuoccolo v Cinelli*, 245 AD2d 245, 246-247 [1997]). Moreover, when interpreting the policy, the court " 'may not make or vary the contract of insurance to accomplish [its] notion of abstract justice or moral obligation' " (*Teichman v Community Hosp. of W. Suffolk*, 87 NY2d 514, 520 [1996], quoting *Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978]; *and see Bretton v Mutual of Omaha Ins. Co.*, 110 AD2d 46, 49 [1985], *affd* 66 NY2d 1020 [1985] ["(a) court, no matter how well intentional, cannot create policy terms by implication or rewrite an insurance contract. Nor should a court disregard the provisions of an insurance contract which are clear and unequivocal or accord a policy a strained construction merely because that interpretation is possible. An insurer is entitled to have its contract of insurance enforced in accordance with its provisions and without a construction contrary to its express terms" (citations omitted)]). If, however, there is ambiguity in the terms of the policy, any doubt as to the existence of coverage must be resolved in favor of the insured and against the insurer, as drafter of the agreement (*Westview Assoc. v Guaranty Natl. Ins. Co.*, 95 NY2d 334, 339 [2000]; *United States Fid. & Guar. Co. v Annunziata*, 67 NY2d 229, 232 [1986]).

A contract of insurance is ambiguous if the language therein is susceptible of two or more reasonable interpretations (*State of New York v Home Indem. Co.*, 66 NY2d 669, 671 [1985]; *Matter of Ideal Mut. Ins. Co. [Superintendent of Ins. of State of N.Y.—Harbour Assur. Co. of Bermuda]*, 231 AD2d 59, 63 [1997]), whereas, in contrast, a contract is unambiguous if the language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion" (*Breed v Insurance Co.*, 46 NY2d at 355; *see also Greenfield v Philles Records*, 98 NY2d 562, 569-570 [2002]; *Bethlehem Steel Co. v Turner Constr. Co.*, 2 NY2d 456, 460 [1957] ["(m)ere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact"]).

In this matter, contrary to the finding of the motion court, we perceive of no ambiguity in the governing language of the subject insurance policy. Indeed, in *54th St. Ltd. Partners v Fidelity & Guar. Ins. Co.* (306 AD2d 67 [2003]), and, more recently, in *Royal Indem. Co. v Retail Brand Alliance, Inc.* (33 AD3d 392 [2006]), this Court addressed the very issue pivotal on this ap-

peal and determined that in order for business interruption insurance to be triggered, there must be a " 'necessary suspension,' i.e., a total interruption or cessation" of operations (*54th St. Ltd. Partners,* 306 AD2d at 67; *see also Royal Indem. Co. v Retail Brand Alliance, Inc.,* 33 AD3d at 392-393).

Numerous other jurisdictions have considered the foregoing policy language and arrived at the same conclusion (*see e.g. Apartment Movers of Am., Inc. v One Beacon Lloyds of Tex.,* 170 Fed Appx 901, 901 [5th Cir 2006] [a slowdown in business experienced by the insured was not a " 'necessary suspension of your operations' so as to trigger coverage for loss of business income"]; *Madison Maidens, Inc. v American Mfrs. Mut. Ins. Co.,* 2006 WL 1650689, 2006 US Dist LEXIS 39633 [SD NY 2006] [although plaintiff's offices sustained serious flood damage, uncontroverted evidence that at least two of plaintiff's employees were able to perform their normal duties indicated that there was no cessation of business to trigger the insured's business interruption coverage]; *Keetch v Mutual of Enumclaw Ins. Co.,* 66 Wash App 208, 831 P2d 784 [1992] [although plaintiffs' motel was buried in six inches of ash following a volcanic eruption, and, as a result, suffered a dramatic decrease in occupancy, it remained open and, therefore, could not recover under its business interruption policy]; *Buxbaum v Aetna Life & Cas. Co.,* 103 Cal App 4th 434, 126 Cal Rptr 2d 682 [2002], *review denied* 2003 Cal LEXIS 225 [2003] [the plaintiff law firm suffered water damage to its offices, but since attorneys working in the office continued to bill hours on the day the flood damage was discovered there was no suspension of operations to trigger the business interruption loss provisions of the policy]). The *Buxbaum* court succinctly stated that:

> "[i]n order for business income coverage to apply, the Policy requires that there be a 'necessary suspension' of operations. This term is not defined in the policy . . . . [¶] Webster's Third New International Dictionary defines 'suspension' as 'the act of suspending or the state or period of being suspended, interrupted, or abrogated.' 'Suspended' is defined as 'temporarily debarred, inactive, inoperative.' These definitions comport with what appears to be the common understanding of the term 'suspension', that is, that it connotes a temporary, but *complete, cessation* of activity. Thus, if one were to apply the plain, ordinary meaning to the use of the phrase

'necessary suspension' within the policy, in order for a claim to fall within the coverage provision it would require that any direct physical loss of or damage to property result in the cessation of [the insured's] operations." (103 Cal App 4th at 444, 126 Cal Rptr 2d at 688, quoting *Home Indem. Co. v Hyplains Beef, L.C.,* 893 F Supp 987, 991 [D Kan 1995], *affd* 89 F3d 850 [10th Cir 1996] [internal quotation marks omitted]; *American States Ins. Co. v Creative Walking, Inc.,* 16 F Supp 2d 1062 [ED Mo 1998], *affd* 175 F3d 1023 [8th Cir 1999] [a claim for lost income was limited to the 13-day period in which the insured's business was suspended after a water main break, despite the longer lasting slowdown in business].)

Accordingly, we find that plaintiff's business interruption loss is restricted to the period between the September 11 attack on the World Trade Center and September 18, when tenants were again allowed to reside in their apartments.

We find unavailing plaintiff's reliance on section G.1. of the policy, under "Loss Conditions," entitled "Resumption of Operations," which states:

"a. Business income loss, other than Extra Expense, to the extent you can resume your 'operations,' *in whole or in part,* by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

"b. Extra expense loss to the extent you can return 'operations' to normal and discontinue such Extra Expenses." (Emphasis added.)

While plaintiff maintains that this mitigation provision, which reduces payments to the extent operations can be resumed "in whole or in part" conflicts with any interpretation of "necessary suspension," which requires total cessation of operations, the plain meaning of the word "resume" indicates that in order for the provision to apply, there must necessarily have been a stoppage of operations " 'from which it was necessary to begin anew' " (*see Buxbaum,* 103 Cal App 4th at 445, 126 Cal Rptr 2d at 689, quoting *Home Indem. Co. v Hyplains Beef, L.C.,* 893 F Supp at 993).

We reject plaintiff's argument that because it was unable to provide a habitable environment for its residents by September 18, it cannot be considered to have resumed operations. In the

first instance, plaintiff submits no evidence to support the conclusion that *any* tenant, let alone *every* tenant, was prevented from returning to their units due to a breach of the warranty of habitability. The majority of the tenants' letters submitted by plaintiff, which are unsworn and inadmissible in any event, seek rent reductions, not release from their leases. Further, plaintiff's own superintendent testified that air filters were changed as often as tenants requested, that the building's HVAC system was undamaged, and that air quality testing, commenced the September in question, was continued on an "ongoing basis," with results within acceptable limits.

Plaintiff also contends that it should be covered under defendant's policy for the "period of restoration," which extended well beyond the one-week period its tenants were barred from their apartments. This argument, however, is also unavailing as the restoration period is only as long as necessary for plaintiff to resume operations, as it is tied in to the requirement that there be a "necessary suspension of your 'operations'" (*see Admiral Indem. Co. v Bouley Intl. Holding, LLC*, 2003 WL 22682273, 2003 US Dist LEXIS 20324 [SD NY 2003] [where the court held that defendant restaurant's restoration period following the September 11 attack ended when it began serving Red Cross volunteers, even though it had not opened, because the period of restoration ended when the business could resume operations]; *Streamline Capital, L.L.C. v Hartford Cas. Ins. Co.*, 2003 WL 22004888, 2003 US Dist LEXIS 14677 [SD NY 2003] [business income coverage only applies to the suspension of plaintiff's operations, indicating that the period of restoration is dependent only on replacing what is necessary to resume those operations]; *accord Duane Reade, Inc. v St. Paul Fire & Mar. Ins. Co.*, 411 F3d 384, 395-396 [2d Cir 2005]).

Finally, the complaints and dissatisfaction voiced by plaintiff, and its tenants, revolve around the dust, smell and inconvenience of lower Manhattan. The policy, however, expressly states that the "period of restoration" does not include any increased period required due to enforcement of any ordinance or law which "[r]equires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or address the effects of pollutants."

In sum, the record establishes that plaintiff had resumed operations as of September 18, 2001, in that it had cleaned most of the debris from the September 11 attacks, changed the building's air filters, reestablished all utilities and allowed ten-

ants to return. Moreover, the air filters continued to be changed regularly, as the tenants forwarded requests, and ongoing air testing was performed indicating the air quality was within acceptable Environmental Protection Agency levels. Thus, plaintiff was no longer suffering a "necessary suspension" of its business operations.

Accordingly, the order of the Supreme Court, New York County (Edward H. Lehner, J.), entered September 19, 2005, which denied defendant's motion for partial summary judgment seeking an order: that under the terms of the policy, the period of restoration during which plaintiff is entitled to recover its actual loss of business income is from September 11, 2001 through and including September 17, 2001; that any loss of income sustained after September 17, 2001 is not within the policy coverage; and that any consequential damages are dismissed with prejudice, should be reversed, on the law, without costs, the motion granted and the matter remanded for further proceedings.

Motion seeking leave to supplement record denied.

ANDRIAS, J.P., WILLIAMS, SWEENY and McGUIRE, JJ., concur.

Order, Supreme Court, New York County, entered September 19, 2005, reversed, on the law, without costs, defendant's motion for partial summary judgment granted, and the matter remanded for further proceedings. Motion seeking leave to supplement record denied.